# Boyd *versus* Boyd.

1. When the party upon whom is charged the exercise of undue influence derives an inconsiderable or no benefit from the will, there must be evidence of such direct influence used at its making as to destroy the free agency of the testator.

2. Where the party charged is a stranger, having no claims from relationship and derives very considerable benefit, such direct proof is not required.

3. General evidence of power exercised over the testator, especially if of comparatively weak mind, though not enough to destroy testamentary capacity, will be enough to raise a presumption, which must be overcome before the will can be established.

4. This is particularly so where the party benefited stands in a confidential relation to the testator.

5. Where a considerable portion of the estate of a testator whose mental faculties are impaired though not destroyed, be given to one standing in such relation, proof of the formal execution of the will in the presence of two witnesses is not enough; the presumption must be rebutted by some evidence that the disposition was the exercise of the testator's free will.

6. In this case a considerable part of the testator's estate was left to a scrivener who drew the will and his relatives, none being relatives of the testator, who was not mentally incapable, the question of undue influence was properly left to the jury.

October 26th 1870. Before Thompson, C. J., Read, Agnew, Sharswood and Williams, JJ.

Error to the Court of Common Pleas of *Westmoreland county:* No. 51, to October and November Term 1870.

This was a feigned issue to try the validity of a writing purporting to be the will of John Boyd, deceased. It was framed,

[Boyd *v.* Boyd.]

March 12th 1869, between John Boyd, Jr., and David Longenecker, executor of John Boyd, deceased, plaintiff, and Margaret Boyd, by her guardian, defendant. The case had been on the trial list at several terms; when it was on the list for November Term 1860, the name of David Longencker, one of the plaintiffs, was struck off.

Margaret Boyd was the only child of the decedent. He left also a widow, Jane Boyd.

The case was tried, November 9th 1869, before Buffington, P. J. The plaintiff having proved the execution of the will gave it in evidence as follows :—

* * * " I direct that all my just debts and funeral expenses be paid as soon after my decease as possible, out of the first monies that shall come into the hands of my executors, from any portion of my estate; also, a monument set over my grave similar to that of my first wife. Next, I direct a fair valuation or appraisement of all my estate, real, personal and mixed, including all the household and kitchen furniture, be made by three judicious neighbors selected by my executors, and after being signed with their names, that a copy thereof be' given to each of my executors.

"Next, I bequeath to my wife Jennie, all the benefits of the Act of Assembly with $50 additional as her portion.

"Next, I bequeath to my infant daughter Margaret Boyd, the sum of $10,000, to be put on interest by my executors, if practicable to be done, and the interest to be collected yearly until she shall arrive to mature age of fifteen years or be married, and if such change shall, in the estimation of my executors, be productive of good results and prospects, then I direct the payment of her legacy to be made to her in part or in whole in the same manner as a parent ought to do, discourage vice, and encourage industry, frugality, &c., to encourage their general welfare. This discrimination I leave with my executors. But should my said daughter Margaret Boyd die at any period during minority and before marriage, then in such case I direct all her funeral expenses, cost of maintenance, education including all other reasonable expenses, &c., to be deducted from her said legacy, and the remaining balance I direct my executors to pay to the following persons, to wit : who are all conditional legatees as follows : to John Blackburn, farmer of Fayette county, Pa., I order one-tenth part conditional ; to Wm. Wagoner, of Baltimore, one-twentieth part conditional ; to Samuel Bell, one-twentieth part conditional ; to Rev. J. D. Walkinshaw, one-twentieth part conditional ; to the United Presbyterian Church in West Newton, Pa., one-twentieth part conditional ; to John Boyd, Jr., of Mendon, one-twentieth part conditional ; to Archibald Boyd, Jr., one-twentieth part conditional ; to Wm. Boyd, one-twentieth part conditional ; to Jacob O. Longenecker, of West Newton, Pa., one-twentieth part conditional ; to Elijah N. Longenecker, of West Newton, Pa., one-twentieth part

[Boyd v. Boyd.]

conditional; to Samuel Coldsmith, one-twentieth part conditional; to Phylanzo Paul, one-twentieth part conditional; to Mary Mosely, one-twentieth part conditional; to Margaret Hunter, wife of David Hunter, one-twentieth part conditional; to David Longenecker, one-twentieth part conditional; to James G. Longenecker, one-twentieth part conditional; to Boyd Sykes, minor child of Hester Ann Sykes, one-twentieth part conditional; to Henry Coldsmith, one-fortieth part conditional; to Mary Hilterbrant, wife of Jacob Hilterbrant, one-fortieth part conditional; and to Hester Ann Sykes, one-twentieth part—all these being conditional devises and twenty in number, if they should ever be payable are not to be paid until after four years from said Margaret's decease, should her decease take place during her minority or before marriage, but no interest.

"I bequeath to Elizabeth Wagoner, daughter of Wm. Wagoner, of Baltimore, one bedstead and bedding including one coverlet, one pair blankets, bolster, pillow, all comprising a complete bed. And to Sarah Margaret Wagoner, another daughter of Wm. Wagoner aforesaid, I bequeath a bureau which I believe to be cherry. 1. To Rev. J. D. Walkinshaw I bequeath the sum of $300. 2. To the United Presbyterian Church of West Newton I bequeath the sum of $300. 3. To Jacob O. Longenecker I bequeath the sum of $300. 4. To John Blackburn, farmer of Fayette county, I bequeath the sum of $200. 5. To Wm. Wagoner, of Baltimore, I bequeath the sum of $200. 6. To Samuel Coldsmith I bequeath the sum of $100. 7. To Phylanzo Paul I bequeath the sum of $100. 8. To Margaret Shupe, daughter of Wm. Shupe, I bequeath the sum of $100. 9. To Mary Mosely I bequeath the sum of $100. I direct my executors to pay these last nine legatees in four years after my decease, or sooner at their option, but no interest. I direct my executors to sell my storehouse and the garden dwelling-house and lot and stabling, either by private or public sale, as soon after my decease as they may consider suitable or expedient, they may have a period of three years to effect such sale if practicable to them, and pay out the aforesaid nine legatees.

"And the balance that may remain I bequeath equally to my executors and any surplus remaining may remain equally in their hands.

"My wife Jennie shall have the mansion-house and lot, stabling, &c., and the dowry of the saddler-shop, and after her decease I direct my executors to sell the mansion-house, lot, stable and saddler-shop, to the best advantage, and the proceeds may remain equally in the hands of my executors for divers good causes, either sold or unsold as they—

"I have estimated my whole estate at $30,000, but should a depreciation occur on bonds, judgments, notes, bank stock, or real

estate, that it don't amount to my estimation, from any cause whatever, then I direct a proportionate reduction on every devise that I have made, and a pro rata divide in the same proportion to every legatee, and if my estate comes to my estimate or exceeds—

" I direct that my wife Jennie shall provide, maintain, clothe and educate my daughter Margaret as a parent ought to do, and in neglect, failure or refusal so to do, then I authorize my executors or the guardian appointed which my said daughter may select, to provide, maintain, clothe, educate my daughter Margaret Boyd, and apply the interest of her said legacy all to that purpose, and if the interest be insufficient then to take as much of the principal of said legacy to meet such requirements, always keeping an eye to economy and frugality. Hereby giving my executors full power to take all lawful means to carry out all my devises, and power also to employ one or more attorneys under them.

" And I hereby nominate, constitute and appoint David Longenecker of West Newton, and John Boyd, Jr., of Mendon, my executors of this my last will and testament, hereby revoking all wills heretofore by me at any time made.

" In witness whereof, I, John Boyd, the testator, have to this my will, written on one sheet of paper, set my hand and seal at West Newton, Pa., this day of 30th September A. D. eighteen hundred and sixty-seven.

" To Hester Ann Sykes I bequeath the interest of $300 during her lifetime, and at her decease the principal to Boyd Sykes, her son.                                   JOHN BOYD, [L. S.]

" Signed, sealed and delivered in the presence of us, who have signed in the presence of each other.

" N. B. Interlining in 19th line ' to be collected,' done before signing.    " Hester Ann Sykes interest to commence in six months after testator's decease, also the word ' proceeds' entered before signing.                          SAMUEL COLDSMITH,
                                    J. O. LONGENECKER."

The plaintiff gave evidence also to show the capacity of the testator. A great number of witnesses testified to his capacity until about three weeks before his death, he having a short time previously received a hurt by a severe blow on his head. There was evidence also of some difficulty with his second wife, which resulted in a complaint against him by her before a magistrate, and in his being subjected to discipline in his church; it was finally amicably adjusted. The testator was about seventy-two years old at his death.

David Longenecker, one of the executors and plaintiffs, having on the 31st of October 1868 *released and declined to receive* " any and all legacies and devises given to" him under the will, and having released the estate " from all claims and demands for ever

[Boyd v. Boyd.]

on account of the same," testified on the trial for the plaintiff: "I knew John Boyd for nineteen years. He often came to count interest, wrote letters; leases; came frequently to me, I was a justice of the peace. I wrote the will in dispute; he came to me to get me to write it. He wanted a change in the will I had written before, the change he wanted I made as stated in the will in dispute. He wanted Coldsmith and Paul to be his witnesses; they were his tenants; he sent Coldsmith to hunt Paul, could not get him, he said my son Jacob O. would do for a witness, he called Jake up, Boyd signed it then the witnesses. I had read the will to him, he said nothing; told me to take care of the will; the condition of his mind was good that day. His capacity to do business was good, could tell me in short terms what he wanted to have done. A will of 25th February 1867, was shown to witness. This was his will of that date. I never knew of William Wagner the legatee in the will until he named him; said he lived in Baltimore, did not know one of the Wagner girls named; said he took John when he was a poor boy; had raised him and would help him. he said Paul was a punctual tenant and he would mind him. I did not know Margaret Shupe, she had kept house for him; said Mrs. Mosely had kept house for him after his first wife died. Hester Sykes was a girl he had raised. Boyd Sykes was his namesake and he wanted to remember him. He said he always wanted to remember my son Jake; was frequently at the shop with him; lent him his gold watch for three months, assigned no reason for giving the other son a legacy; said nothing about James; they were to get in. Boyd died 8th or 9th January 1868. His first wife died in June 1864. He married second wife in February 1865."

Being cross-examined, he said: "I wrote three wills in 1867; one before in January 1863 which he destroyed; he left it principally to his first wife and Hester Ann Sykes; she died in June 1864; second will on 25th February 1867. Dick and myself were executors. David H. Pollock and myself were witnesses in the first will. We were residuary legatees. Coldsmith and Paul were witnesses. Coldsmith is a brother-in-law; Paul no relation, lives in West Newton; the child was then born gets the same as in this; if she died, twenty legatees. The February will was written in my office, no one present, signed in my shop. He estimated his estate at $30,000 at that time. I did not take an account of his estate. He came to me and wanted to make an account of his estate; it was then $32,000; saw. his notes, told me of his judgments and bank stocks; the real estate was counted in; this was in 1862, before I wrote the first will; don't mind the valuation. He took the calculation; said he had it at home, could not find it; made a second calculation, could not get as much; at that time it was $30.000; brought his notes, told me of the certificates of the bank stock, told me of $1000 of oil stock that was lost; it did not bother me, it was not my business.

[Boyd *v.* Boyd.]

" He wanted 20 to be conditional legatees; I set the will as he wanted it. I counted it first and asked if that would do? I wanted him to give Hester Ann Sykes more, when he set himself then. I would not pretend to control him. He gave her what he allowed would allow her $50 more. I suggested that to him; I told him she would make trouble. Said nothing against his wife. I told him I would write it down if .said so, if not I would not do it; said he did not like Mr. Hunter, gave no reason; said nothing of Cowan. I kept the wills; told me I should keep them; I wanted him to keep the wills, he said I should keep them; he complained of the February will about one week before the will in dispute is written; took no account of his estate. Coldsmith and Longenecker were witnesses, it is the will we are trying now. Twenty conditional legatees were to get the child's share; if it lived he wanted the child to get it; good many of my relations, not ten, perhaps seven or eight.

" I never went to his house with pen, ink and papers to get the items of the will of 30th Sept. 1867. I never went to Boyd's house to solicit him to write this will; never went there to write a will and the old man avoid me. I wrote three wills in 1867. He came to me to have me make an estimate. He had a store-house, dwelling-house, mansion-house and out-lot."

The will in controversy, and that of February, were signed at Longenecker's office.

The will of February 1867, was as follows:—

* * * " Also I direct that a fair valuation or appraisement be made by three judicious neighbors, of all my estate including my household and kitchen furniture and after being signed with their names that a copy of the same be given to each of my Executors.

" Next I hereby bequeath to my beloved wife, Jennie C. Boyd, all the rights interest and benefit allowed her by the Act of Assembly in such case made and provided with Fifty Dollars additional, and to my infant daughter Margaret I bequeath the sum of Ten Thousand Dollars with all the interest that can be made to accrue thereon when she shall to the age of twenty-one years to be invested in 5-20 gold bearing bonds of the United States as a safe investment)
(provided that if my said infant daughter Margaret shall not live till she shall arrive to twenty-one years of age then in such case I direct her portion as follows: twenty-five hundred thereof I bequeath to Wm. Wagner of the City of Balt., and twenty-five hundred dollars I bequeath to John Boyd of Mendon South huntington Ship and twenty-five hundred dollars, I bequeath to Samuel Bell, and twenty-five hundred dollars I bequeath to Jacob O. Logenecker tiner, of West Newton borough; these four last devises fulfills my infant daughter Margaret's portion to a close,) these four last devises are only conditional.

[Boyd v. Boyd.]

" Next, bequeath to John Blackburn of Fayette county Penn., all my Bank stock in National Bank of Brownsville, formerly Monongahela Bank of Brownsville. I bequeath to Mary Hilterbrand, wife of Jacob Hilterbrand, the sum of one hundred dollars. I bequeath to my friend Jacob O. Longenecker tiner, my gold lever and also the sum of two hundred dollars, I bequeath to Rev. J. D. Walkinshaw the sum of three hundred dollars. I bequeath to Samuel Coldsmith the sum of one hundred dollars, and to the United Presbyterian Church in West Newton the sum of three hundred dollars and the balance that may remain of my estate I will and bequeath equally to my two Executors to be at their control in settlement of my estate and Court charges and for all claims that may justly be paid.

" I direct that my executors shall be well paid for carrying out· my devises and also attornies one or more under them.

" But should there be a depreciation in the value of my real estate or loss on my judgments, Bonds, notes, &c., or on both then in such case I direct that a proportionate reduction equal to such depreciation and loss be made and deducted from every devise that I have except my wife, Jennie C. Boyd, her portion shall not be changed.

" And I constitute and appoint my esteemed friends, James A. Dick and David Longenecker, each of the borough of West Newton to be my Executors of this my last Will and testament hereby revoking all former Wills by me at any time made, hereby giving full power to my Executors to sell, convey in writing or otherwise, and to settle up all my estate according to the foregoing devises intentions and meaning and to all other legal acts thereunto appertaining to in and of my entire estate to the best of their knowledge. I direct that after my wife's decease that all my real estate shall descend to Archibald Boyd junior, and Wm. Boyd and Margaret Hunter wife of David Hunter to be divided equally amongst these three persons,

" And lastly, I direct as before I have directed, that after the legacies are distributed and subject to depreciation and loss that the remaining balance shall descend to James A. Dick and David Longenecker my Executors for the expenses purposes aforesaid. In witness I the testator have to this my will written on one sheet of paper set my hand and seal this　　day of　.　A. D. eighteen hundred and sixty-seven.

" Signed sealed and delivered in the presence of us who have signed in the presence of each other. Since writing the foregoing I have changed the period 21 years respecting the age of my daughter Margaret that it shall be 18 years of age in both cases.

" I also direct a change in regard to my gold lever watch that
16 P. F. Smith—19

[Boyd *v.* Boyd.]

I rule that back again but 200 Dollars devise shall remain additional.

" In witness whereof I the testator have to this my last will and testament set my hand and seal this 25th of February eighteen hundred and sixty-seven.

" Signed sealed and delivered in the presence of us who have signed in the presence of each other last I direct that Phylanzo Paul shall have one hundred dollars subject to the same proportion as the former devises.
"SAMUEL COLDSMITH.
PHILANZO PAUL.

" JOHN BOYD. [L. S]."

John C. Plumer testified for the defendant, that on the 5th of November 1867, the testator called on him to write his will; testator said he had an heir now and a wife; they should have his estate, except " two outsiders "—John Blackburn, who " had lived a long time with him, and was faithful, and Jerry Boyd, as good-hearted a boy as ever lived—was doing nothing, and he would *start* him in business."

There was evidence for defendant tending to show that the testator had been always a man of rather weak intellect; that he was very illiterate, some witnesses testifying that he could write little more than his own name; that for some time before the execution of the will he exhibited marks of insanity. The evidence of the defendant was quite uniform that he had not capacity to dictate or comprehend such a will as that in controversy.

There was evidence also that the testator confided greatly in David Longenecker, referred to him for advice about his business, and that Longenecker did his writing for him.

During the trial the plaintiff offered a letter from Dr. J. W. Blackburn to J. A. Dick, which on objection of the defendant was rejected and a bill of exceptions sealed.

The plaintiff's 4th point and its answer were:—

" Fraud and undue influence are not to be presumed, but must be proved by the party impeaching the will, and there is no sufficient evidence in this cause of such fraud and undue influence as would warrant the jury in setting aside the will on that account."

Answer: " The first part of this point, in regard to the nature of the proof to establish fraud or undue influence, is correct, and is answered in the affirmative. But whether the evidence is sufficient for that purpose is for the jury to determine, and not the court. Fraud is not to be presumed, nor can it be established by slight circumstances. Positive evidence, however, is not required, and circumstantial evidence is sufficient if it make out the facts to the satisfaction of the jury. We think further that there are

[Boyd *v.* Boyd.]

circumstances in this case from which the jury may infer the fact of undue influence, but whether they are so qualified by other evidence in the cause as to destroy their effect or impair it, or render it doubtful, is for the jury. It is not a case in the chancery side of the court, in which the court are required to pass upon the facts or sufficiency of the proof. With this explanation we answer this latter part of the point in the negative."

Amongst other things the court charged :— * * *

. " Such is the infinite diversity in the minds and conditions of men, both those in a sound state and those in an unsound condition, that it is extremely difficult to define and classify their characteristics. And if difficult. in the case of intelligent men, how much more so must it be in the case of those unfortunate beings upon whom the hand of Providence has been sorely laid, and who have not discernment to conceive or describe their wandering and delusive fancies. [This subject, therefore, as it baffles the establishment of any rule, is wisely left by our laws to the sound judgment and practical good sense of a jury.] Still amidst the multitude of attempted distinctions and definitions by medical writers, there are some features or phases that it may be well to suggest for the aid and consideration of the jury in their deliberations on this intricate and interesting subject." * * *

After mentioning the different kinds of insanity, and what would be evidence of its existence, and commenting on the evidence in this case in reference to it, the judge proceeded :—

* * * " In making a will by an aged and infirm man, whose body and mind have been impaired by disease, great care and caution should be observed in guarding him from imposition. Although his mind should be of sufficient soundness, if left free to work out its own designs, uninfluenced by improper means and unprejudiced by any fraud or deceit, yet if weak and feeble and worked upon by any cunning devices to warp it from its own deliberate purpose, and pervert it to the benefit of others, it would not be his will. The law does not condemn fair persuasions to make a will, provided the will of the testator is left uncontrolled, and the persuasion may be such as to induce the making of the will in his own favor, provided the mind and will of the testator is left free, but no falsehood or undue persuasion will be countenanced or tolerated by the law.

[" The prominent facts relied on are his expressed disposition to Mr. Plumer to leave his property to his wife and child. The fact that the scrivener was named as executor, and himself and family and relatives derive considerable advantages under it, the unsatisfactory evidence alleged as to the reading of the will, and the fact that the scrivener retained the other wills, thus it is said by defendant, conceived some fraudulent design, and other circumstances given in evidence.]

" The jury will judge of them. The presumption is that of fairness, as we have seen it, of sanity in regard to the mind; fraud is not to be presumed, but fraud may be proved as to this fact also; and if so, the jury will judge it." * * *

The verdict was for the defendant.

The plaintiff took a writ of error, and assigned for error the parts of the charge in brackets, and the answer to the 4th point; also,

" 4. The court erred in rejecting the letter of Dr. Blackburn to James A. Dick."

*H. C. Marchand* and *E. Cowan*, for plaintiff in error.—It should not have been left to the jury to say what was the rule as to insanity: McMasters *v.* Blair, 5 Casey 303. The *facts* testified to did not indicate insanity—opinions were not evidence : Dickinson *v.* Dickinson, 11 P. F. Smith 404.

*H. P. Laird* and *H. D. Foster* (with whom was *J. A. Hunter*), for defendant in error.—The amount of undue influence necessary to avoid a will varies according to the strength of mind in the testator : 1 Jarman on Wills 36, 41; Eckert *v.* Flowry, 7 Wright 52; Daniel *v.* Daniel, 3 Id. 191 : Leech *v.* Leech, 9 Harris 69; McTaggart *v.* Thompson, 2 Harris 149.

The opinion of the court was delivered, January 3d 1871, by

SHARSWOOD, J.—The main contest on the trial of the feigned issue in the court below was, as to the mental competency of the alleged testator to make a will, at the time the paper propounded was executed. Upon that subject in all its aspects, as presented by the evidence, the learned judge delivered to the jury an able and lucid charge, explaining to them, clearly, what was the legal standard of testamentary capacity. To the charge in regard to that question no error has been assigned, except to a single paragraph, extracted from the body of it, and by which it is supposed, contrary to the whole tenor of his instructions, that the jury were told that there were no legal rules, but that it was committed entirely to their discretion. We must read the passage in connection with what preceded and followed, and so interpreted, it could not have been misunderstood. All that the learned judge meant to observe was that, as there was an infinite diversity in the minds of men, both in a sound and an unsound state, it was not possible for the law to draw any marked line, so as to say, on this side is sanity, on that insanity; that certain actions are the acts of a man incompetent to make a will, because the same actions may evince such incompetency in one man, but fall far short of it in another. Eccentricity is not insanity or mental incompetency, nor always even evidence of it. A man may all his life have

[Boyd v. Boyd.]

strange and unusual, and even ridiculous ways, from habitual indulgence in mere absence of thought—in reveries or day-dreams—he may dodge his acquaintances—behave as though he saw things having no existence but in his imagination, and yet thereby evince no want of testamentary capacity. But if, after having attained mature life without exhibiting any such eccentricities, his character afterwards undergoes a change, it may well induce a belief that it is the result of some morbid condition of his intellectual faculties, especially when connected with any lesion or derangement of the physical organism. We see no error, therefore, in this part of the charge, which is the subject of the 3d assignment.

The most important question in the cause is, whether there was any evidence of undue influence exercised over the mind of the testator in the making of the will in question, which justified the court in submitting to the jury to find a verdict against its validity on that ground alone. This is raised by the 1st and 3d assignments of error, which may therefore be considered together.

Undue influence is very nearly allied to fraud, yet it may be true that they are not identical, so that while undue influence comprehends fraud—fraud by no means embraces every species of undue influence: Redfield on Wills 510, n. A person, for a very disinterested purpose, and because he sincerely believes that it is the duty of a testator to make a will of a particular character, may carry his persuasion and influence beyond that point which is legitimate. Yet it would hardly deserve so harsh a name as fraud. But where the end and purpose of the influence is the benefit of the party employing it, it is not easy to distinguish and save it from that imputation. Hence, when the party upon whom rests the charge, derives none, or a very inconsiderable benefit from the will, there must undoubtedly be evidence of direct influence exerted at the time of making the will; such as in effect to destroy the free agency of the testator: Eckert v. Flowry, 7 Wright 46. But where, being an entire stranger—having no claims from lawful relationship—he derives a very considerable benefit from the act, such direct proof ought not to be, and is not required. Such was the case of Dean v. Negley, 5 Id. 312. General evidence of power exercised over the testator, especially if he be of comparatively weak mind from age or bodily infirmity, though not to such an extent as to destroy testamentary capacity, will be enough to raise a presumption, which ought to be met and overcome before such a will can be established. Particularly ought this to be the rule when the party to be benefited stands in a confidential relation to the testator. "Where the party," says Mr. Redfield, " to be benefited by the will has a controlling agency in procuring its formal execution, it is universally regarded as a very suspicious circumstance, and one requiring the fullest expla-

hation. Thus, where a will was written by an attorney or solicitor, who is to be benefited by its provisions, it was considered that this circumstance should excite stricter scrutiny, and required clearer proof of capacity, and the free exercise of voluntary choice:" Redfield on Wills 515, citing Duffield *v.* Robeson, 2 Harring. 384. Uudoubtedly if the counsel of an old man whose mental faculties are impaired, though not destroyed by advanced age, should draw for him a will giving to himself the bulk of his estate, or a very considerable part of it, it would not be enough to show the formal execution of the paper, in the presence of two subscribing witnesses called in for the purpose. He must go further, and rebut the presumption by some evidence that the disposition made was the exercise of the free will of the testator. "The existence of that fiduciary relation," says Mr. Redfield, "does not annul the testamentary act in favor of the attorney by his client; but such fact calls for watchfulness, lest some improper influence may have been exercised. There should be very clear evidence of mental capacity and proof independent of the *factum* that the mind free and unbiassed accompanied the act:" Redfield on Wills 529.

Let us see, then, if there was any evidence in this case which raised this presumption and shifted the *onus.* If there was, it was a question for the jury; and however slight and in themselves insufficient in an ordinary case the circumstances mentioned by the learned judge would have been, there was no error on his part in calling the attention of the jury to them.

John Boyd was a man upwards of seventy years of age,—infirm of body, and certainly not of a strong mind,—exceedingly illiterate—able to write his name, perhaps to read, but not much more—during the latter years of his life showing, to say the least, indications of folly or eccentricity. David Longenecker was not indeed a lawyer, but he was or had been a justice of the peace, and was his adviser in business matters. He acted as the scrivener in drawing this will, two prior ones, and one subsequent. Not to refer to smaller legacies to different members of his family and relatives, it gave a very considerable benefit to him personally. As appears by the instrument itself, and by David Longenecker's own testimony, John Boyd estimated his estate at thirty thousand dollars. Besides the mansion-house, lot, stabling, and the dowry of the saddler-shop devised to his wife for her life, and after her decease to be sold and converted into money, he gave to her all the benefits of the Act of Assembly, with fifty dollars additional as her portion. What the value of the real estate was does not appear, but it will be near enough for the sake of the argument to consider this as a bequest to her of ten thousand dollars absolutely. Then he gives ten thousand dollars to his only child, Maggie, with a limitation over in case of her death before twenty-one and marriage, to some twenty persons, among them

[Boyd v. Boyd.]

Longenecker and two of his sons. Then follow several legacies—one of them to a son of Longenecker—amounting, in all, to seventeen hundred dollars; leaving as the residue of his estate, according to his estimate, eight thousand three hundred dollars.

This would be considerably increased by the conversion of his real estate into money after the death of his wife—to what probable extent does not appear. Then follows: "And the balance that may remain I bequeath equally to my executors, and any surplus remaining may remain equally in their hands;" and immediately afterwards, as to the money produced by the sale of the real estate: "the proceeds may remain equally in the hands of my executors for divers good causes, either sold or unsold, as they——," and here there is a break, leaving the sentence unfinished. David Longenecker and John Boyd, Jr., are then named the executors. Now, is it at all probable, after all this string of legacies, conditional and absolute, that John Boyd, being a man not apt at figures,—doing all his counting in his head,—would know how much of his estate this balance would probably be? David Longenecker, in his testimony, does not say that he explained it to him; that he placed before him a calculation showing what the residue thus given to the executors would probably be. In the relation in which he stood it was incumbent upon him to have done this, and, if he had been wise, to call in a disinterested person to witness the fact of his having done so. I consider the following clause also as calculated to strengthen the presumption that John Boyd had no idea what amount of his estate he was thus giving to his executors: "I have estimated my whole estate at thirty thousand dollars, but should a depreciation occur on bonds, judgments, notes, bank-stock or real estate, that it don't amount to my estimation, from any cause whatever, then I direct a proportionate reduction on every devise I have made, and a *pro rata* divide in the same proportion to every legatee; and if my estate comes to my estimate or exceeds——" Here there is another break, and an unfinished sentence. It is clear that the penman intended that the bequest to the wife and child, all the other legacies, and also the residuary bequest, should abate in proportion if the estate fell short of thirty thousand dollars. Is it likely that if John Boyd had supposed that this residue would be one-third part, and including the proceeds of his real estate after his wife's death, perhaps much more than a third of all his property, that he would not have left the depreciation to fall on that alone? But that is not all. There was in evidence a previous will of John Boyd, dated February 25th 1867, also drawn by David Longenecker, and of which he and James A. Dick were named as executors, which shows clearly to my apprehension that he did not consider that this residue would be more than a reasonable compensation to his executors for their trouble. The

[Boyd *v.* Boyd.]

frame of the will is very much the same as the present, and the amount of the residue, except as to the real estate, does not differ materially. It provides, "the balance that may remain of my estate I will and bequeath equally to my two executors, to be at their control in settlement of my estate and court charges, and for all claims that may justly be paid. I direct that my executors shall be well paid for carrying out my devises, and also attorneys, one or more, under them." "And lastly, I direct, as before I have directed, that after the legacies are distributed and subject to depreciation and loss, that the remaining balance shall descend to James A. Dick and David Longenecker, my executors, for the expenses, purposes, aforesaid." In this connection, the conversation detailed by John C. Plumer, in November 1867, was very significant: "He came to me in November 1867, and wanted me to write his will. He said it would be short; that he had a will in Betsy's time, in which there was considerable settlement; said he had an heir now, little Maggie, and a wife; they should have it, except two outsiders, and he named them,—John Blackburn and Jerry Boyd." On a subsequent day there was another conversation upon the same subject. "Came across what he had said before, that his wife and Maggie were to have the greater part of his estate, and two outsiders."

"It is always," remarks Mr. Redfield, "the proper inquiry, in regard to undue influence, whether it operated as part of the transaction in making the will in question. And as that is an act always ambulatory, during the life of the testator, his conduct after its execution is entitled to some weight in determining its validity:" Redfield on Wills 526.

On the whole, we have arrived at the conclusion that there were circumstances in evidence in this case which raised the presumption that David Longenecker had taken advantage of the confidential position he occupied as legal adviser and scrivener, to secure substantial benefits to himself and his family, and that it threw upon the plaintiff in the issue the *onus* of showing that the provisions of the will were fully explained to and understood by the testator, and fully assented to by him. This, as we have said, necessarily made it a question for the jury, and justified the learned judge in submitting it to them in the manner he did.

In regard to the 4th assignment of error, it is enough to say that it is not according to Rule 8, 6 Harris 578, and therefore is to be holden for none.

Judgment affirmed.