### In re WILL OF AMELIA EVERETT.

#### (Filed 21 September, 1910.)

**Wills—Devisavit Vel Non—Undue Influence—Confidential Advisor— Evidence, Sufficient.**

> In an action to set aside a will for undue influence, evidence is sufficient to go to the jury which tends to show that deceased was illiterate, and devised or bequeathed her whole estate to her brother and his daughter, leaving to her son, the caveator, only $10; that the brother, her confidential business advisor, upon whom she relied, had the testatrix at his house during her last illness, and at that time would not permit the caveator to see his mother without the presence of himself or his daughter, and had the will written and signed under circumstances tending to show that the testatrix was unaware of its contents and kept it in his own possession; that the testatrix had theretofore expressed the desire of providing for her son, with whom she was on good terms; that he procured the testatrix, just before her death to sign a check drawing all her money from the bank, which he gave to his daughter, who then left and remained from the State. The doctrine of presumptions, burden of proof and the character of the evidence required, discussed by Brown, J.

Appeal from *Ferguson, J.,* at January Special Term, 1910, of Washington.

This is an issue of *devisavit vel non.*

The propounders of the will are Addison Everett, the brother of testatrix, the executor to the will, and certain other legatees. The caveator is Harry Wheelock, the only son of testatrix.

This issue was submitted: Is the paper-writing propounded and every part thereof the last will and testament of Amelia Everett? Answer, No.

From the judgment rendered the propounders appeal. The facts are fully stated in the opinion of the Court.

Brown, J. The only assignment of error presented here is the refusal of the judge to charge the jury that there is no sufficient evidence of undue influence.

The testimony tends strongly to prove that Addison Everett, the executor, was the business adviser of his sister, the testatrix; that a few days before her death, at a time when she was very sick in bed, he procured from her a check for about $900, all the money she had in bank; that Addison stated he was getting the money for testatrix' mother, but in fact he gave it to his own daughter, who afterwards left for New York and has not returned. Said daughter was in the room when the will was signed, and had the will when the witness entered the room. When Addison went in the room with the witnesses, he said, "Here are parties to witness will." All the witnesses agreed that from the time the parties entered the room, up to the time they left, the sick woman did not speak a word to anybody about the will or anything else, she being in bed in desperate condition at the time. Addison was appointed executor. He got a large part of the dead woman's property. His wife, his daughters and his brother got all the balance of her property, except ten dollars, which by the terms of the will were given to her son. It appears that the son sent some squirrels to his mother, who was sick, and when Addison saw the son he offered to pay him for the squirrels. It appears that the daughter of Addison offered to pay the sick woman's son for something he had sent her to drink. It appears from the testimony that the only person from whom the sick woman had been in the habit of getting advice about her business affairs was Addison Everett. She was sick in Addison's house at time referred to. It further appears that Addison, when the witnesses went in the room, after saying, "Here are the witnesses to sign the paper," himself got the pen for D. Lee, one of the witnesses, to sign. It further appears that after the woman was dead Addison refused to let her son go in the room to see her body until one of his daughters was there to go in with him, and that Addison himself took sole charge of the funeral arrangements; that he has always "been against the caveator," to use the language of Wheelock, and that in arranging for the funeral he put himself and family to follow the corpse, then allowing a

lot of people who were not related in any way to the dead woman
to come immediately behind his family, and that the caveator,
the only son of the dead woman, was assigned to a place at the
back end of the procession; that after said will had been offered
for probate before the clerk, Addison remarked to said son that
his mother had given him more than she ought to have given
him.    It appears from Wheelock's testimony that Addison, his
wife and daughter, would give him no opportunity at any time
to talk to his mother without one or more of them being in the
room with her; that he and his mother were friendly and he
went to see her each day.    It appears that the will was written
by one Johnson, who says the deceased never spoke to him about
it; that he wrote it at the instance of an attorney, in the attor-
ney's office, testatrix not being present, and said attorney was
in the court-room during the entire trial, and propounder did not
put him on the stand as a witness; that the woman, for years
before her death, had been friendly with her son, and had said
she intended to properly provide for him.    Under the will the
executor, Addison Everett, and his daughters get practically the
testatrix' entire estate.

Experience has shown that direct proof of undue or fraudu-
lent influence is rarely attainable, but inference from circum-
stances must determine it.    Therefore, it seems to be generally
held that when a will is executed through the intervention of a
person occupying a confidential relation towards the testatrix,
whereby such person is the executor and a large beneficiary
under the will, such circumstances create a strong suspicion that
an undue or fraudulent influence has been exerted, and then the
law casts upon him the burden of removing the suspicion by
offering proof showing that the will was the free and voluntary
act of the testator.    Pritchard on Wills, sec. 133, and cases cited.
*Watterson v. Watterson,* 1 Head., 1; Gardner on Wills; *Max-
well v. Hill,* 5 Pick., 584; sec. 62; Schonles, sec. 240.

In such condition of the proof, as said by Gardner, "the pro-
ponent must then go on with the evidence and cause the scales to
at least balance."    Wills, sec. 62; *Coghill v. Kennedy,* 119 Ala.,
641.

The decided cases are numerous wherein some feeble, decrepit

or dying person appears, as in this instance, to have been brought under a strong and exclusive influence to make an unfair will such as the testator was not likely to have made at his own instance. Then conbined circumstances, less suspicious than those in evidence here, become of great consequence and easily shift the burden of proof of *bona fides* upon those who set up the instrument and claim its benefits. *Marx·v. McGlyn,* 88 N. Y., 357; *Harvey v. Sullen,* 46 Mo., 147; *Ray v. Ray,* 98 N. C., 566; Schonles, sec. 240, and cases cited.

By the Roman law *qui se scripsit hacredem* could take no benefit under the will. While such is not the rule of the common law, yet that law requires proof which must free the paper from suspicion. It was long ago laid down by Sir John Nichol in *Parker v. Ollatt* (2 Phillim, 323), and approved by *Baron Parke* in *Barry v. Butlin,* 12 Eng. Reports, that where a party prepares or procures the execution of a will under which he takes a benefit, that of itself is a circumstance that ought generally to excite suspicion and calls upon the court to be vigilant in examining the evidence in support of the instrument, in favor of which it ought not to pronounce unless the suspicion is removed, and it is satisfied that the paper propounded does express the true will of the deceased.

General evidence of power over a testator, especially of weak mind, or suffering from age and bodily infirmity, though not to such an extent as to destroy testamentary capacity, has been held in this country to be enough to raise a presumption that ought to be met and overcome before a will is allowed to be established. *Robinson v. Robinson,* 203 Pa. St., 403; *Miller v. Miller,* 187 Pa., 572; *Boyd v. Boyd,* 66 Pa., 283. In this last case, referring to above rule the Court says: "Particularly ought this to be the rule when the party benefited stands in a confidential relation with the testator."

*Judge Redfield* says: "Where the party to be benefited by the will has a controlling agency in procuring its execution, it is universally regarded as a very suspicious circumstance and one requiring the fullest explanation." Wills, 515.

This text has been adopted and approved generally by the courts of this country. 27 Am. & Eng. Ency., 488; Gardner on Wills, p. 189.

*Prof. Wigmore* says: "Where the grantee or other beneficiary of a deed or will is a person who has maintained intimate relations with the grantor or testator, or has drafted, or advised the terms of the instrument, a presumption of undue influence or of fraud on the part of the beneficiary has often been applied." Sec. 2503, and cases cited in note.

The courts of appeals of Virginia declare: "When a will executed by an old man differs from his previously expressed intentions and is made in favor of those who stand in relations of confidence or dependence towards him, it raises a violent presumption of undue influence which should be overcome by satisfactory testimony." *Hartman v. Strickler,* 82 Va., 238; *Whitelaw v. Sims,* 90 Va., 588; 1 Jarman Wills, 71, 72.

Undue influence is generally proved by a number of facts, each one of which standing alone may be of little weight, but taken collectively may satisfy a rational mind of its existence.

From the several facts offered in evidence by the caveator the inference is strong that the will in question was the result of a controlling and improper influence upon the part of the propounders and especially the executor. The making and execution of the paper was surrounded by all the *indicia* of undue influence.

The testatrix was an old and feeble woman in her last illness in the house of propounders. She could not read or write and had to make her mark. There is no evidence that the paper was explained to her or that she fully understood its contents. The inference is strong that the executor, and chief beneficiary, had the paper written at a lawyer's office and kept possession of it, and that he was "master of ceremonies" at its execution. He and his daughters take the entire estate except ten dollars, which is the sole legacy to testator's only child, for whom she had, only, a short time before, expressed a purpose to properly provide.

Shortly before the execution of the will the executor had procured from testator a check for her entire bank funds and given them to his own daughter. The son was carefully excluded from

any private conversation or intercourse with his mother, and not permitted to see her except in presence of propounder's wife and daughters. The executor was for years her confidential adviser and business agent as well as brother.

In view of such facts in evidence, under the rulings of many courts, as well as the teachings of text-writers, the doctrine of presumptions would be applied and the burden be cast upon the propounders to rebut a presumption of fraud and undue influence.

But it is not necessary that we pass on that question now, as the court below, so far as the record discloses, did not apply the doctrine or place such burden upon the propounders. His Honor appears to have submitted the question of undue influence to the consideration of the jury without instruction as to the burden of proof, and to the charge as given no exception seems to have been taken.

No error.