IN THE MATTER OF THE WILL OF GLADYS BAARS CAMPBELL

No. COA01-1223

(Filed 31 December 2002)

**1. Wills— caveat—partial summary judgment authorized**

Partial summary judgment is authorized in caveat proceedings on issues other than the validity of the will, including undue influence.

**2. Fiduciaries— university procurement of bequest—relationship open, fair, and honest**

Campbell University carried its burden in a caveat proceeding of proving that its fiduciary relationship with the decedent was open, fair, and honest where undue influence in obtaining a bequest was alleged.

**3. Wills— undue influence—insufficient evidence**

The caveators to a will failed to carry their burden of showing undue influence by Campbell University where they did not show that the decedent was susceptible to undue influence when she executed her will and codicil.

**4. Wills— caveat—will and codicil duly executed—peremptory instruction**

The trial court did not err in a caveat proceeding by instructing the jury that the will and codicil were duly executed.

Appeal by caveators Fred Baars, Carole Baars, Sue Baars Smith and Emerson Campbell from order and judgment entered 25 April 2001 by Judge John R. Jolly, Jr., in Harnett County Superior Court. Heard in the Court of Appeals 5 June 2002.

*Johnson and Johnson, P.A., by Sandra L. Johnson and Rebecca J. Davidson for propounder appellee.*

*Everett & Everett by Robinson O. Everett; Everett, Gaskins, Hancock & Stevens by Hugh Stevens; and Newsom, Graham, Hedrick & Kennon, P.A., by Josiah S. Murray, III, for caveator appellants.*

**IN RE WILL OF CAMPBELL**

[155 N.C. App. 441 (2002)]

McCULLOUGH, Judge.

This case arises out of a challenge to the will and codicil of Mrs. Gladys Baars Campbell who, at the time of her death on 16 May 1996, was a widow with no children. Caveators Fred Baars, Carole Baars, and Sue Baars Smith are siblings, and the nephew and nieces of Mrs. Campbell. Caveator Emerson Campbell is Mrs. Campbell's brother-in-law. The facts leading to this appeal are as follows: Mrs. Campbell was born in 1906 in Duplin County, North Carolina, and attended both Buies Creek Academy (which later became Campbell University), and a nursing school in Charlotte, North Carolina. Mrs. Campbell devoted her entire working career to nursing. Mrs. Campbell and her first husband, Albert Ezell, lived in North Carolina for several years, but later moved to Florida, where Mrs. Campbell resided for approximately fifty years. During their marriage, Mrs. Campbell was the primary breadwinner; she managed her own money and planned for her financial security. Mrs. Campbell continued working as a nurse after Mr. Ezell died in 1971. She met and married Harold Campbell several years later.

During Mrs. Campbell's marriage to Harold Campbell, the couple lived primarily in Florida, but also spent part of each year in Pennsylvania, where Mr. Campbell's family was located. On trips between Pennsylvania and Florida, Mr. and Mrs. Campbell often stopped in North Carolina to visit Mrs. Campbell's siblings, nieces and nephews, and their families. The Baars caveators did not visit, call, or write to Mrs. Campbell while she was married to Mr. Campbell, nor did they contact her when Mr. Campbell died. Emerson Campbell kept in touch with his brother and sister-in-law and visited at least once a year until Harold Campbell passed away in April 1984.

Mrs. Campbell asked her niece, Ruth Meissner, to accompany her to Pennsylvania for Mr. Campbell's funeral in April 1984. Mrs. Campbell was particularly close to Mrs. Meissner, and stated to others that Mrs. Meissner was the only one of her nieces or nephews that cared about her and tried to find out what she needed. Mrs. Meissner later accompanied Mrs. Campbell on another trip to Pennsylvania, so that Mrs. Campbell could handle the business and personal matters relating to Mr. Campbell's death on her own.

On 6 June 1984, a few months after her husband's death, Mrs. Campbell executed a will in Florida which gave most of her estate to two charities, her brother-in-law Emerson, and a number of her nieces and nephews. The named executors were Ruth Meissner and

Mrs. Campbell's Florida attorney. In an effort to better manage her money, Mrs. Campbell executed a Revocable Assets Management Trust in 1985 and named both herself and Florida National Bank as trustees. The beneficiaries of the trust were the same as those mentioned in her 1984 will, as well as one more niece; however, Mrs. Campbell did change what each would receive.

In April 1986, Mrs. Campbell contacted her nephew Davis Bulluck to come to Miami and help her resolve a matter with her bankers, whom she suspected had misplaced some of her money. After Mr. Bulluck reviewed and organized her records, he agreed with Mrs. Campbell that the bank had misplaced several thousand dollars. During his review of Mrs. Campbell's financial records, Mr. Bulluck saw a copy of his aunt's will and encouraged her to move her money into more lucrative accounts. Mrs. Campbell sent her nephew a $3,000.00 check to thank him for his assistance.

In December 1986, Mrs. Campbell donated $10,000.00 to the scholarship fund at Campbell University, located in Buies Creek, North Carolina. This event marked the first contact between Mrs. Campbell and the University since she attended Buies Creek Academy (the University's predecessor) in the 1920s. Apparently, Mrs. Campbell's name appeared on Campbell University's mailing list because she attended Buies Creek Academy. Shortly after her donation was received, Mrs. Campbell received a phone call from Mr. Frank Upchurch, the University's Vice President of Advancement. During her dealings with Campbell University, Mrs. Campbell became friends with Mr. Upchurch. As part of his duties, Mr. Upchurch contacted contributors, thanked them for their support, and kept them informed of happenings at the University. Mr. Upchurch called Mrs. Campbell periodically and sent her publications about the University and about charitable contribution opportunities.

The following April, Mrs. Campbell established a scholarship trust agreement in her name and gave a $30,000.00 phonathon pledge and gift to the University. Within the month, Mr. Upchurch flew to Miami to meet Mrs. Campbell in person and spent a few hours with her. It was during this visit that Mrs. Campbell first told Mr. Upchurch that she was thinking of moving to North Carolina. They saw each other again in June 1987, when Mrs. Campbell visited the University during a stay in North Carolina.

Over time, Mr. Upchurch kept in frequent contact with Mrs. Campbell. In October 1987, Mr. Upchurch and his wife took Mrs.

IN RE WILL OF CAMPBELL

[155 N.C. App. 441 (2002)]

Campbell and her niece Ruth Meissner on a two-day sightseeing trip to the Outer Banks, just after Mrs. Campbell and her niece attended Homecoming at the University. Mrs. Campbell told Mr. Upchurch that she was seriously contemplating a move to North Carolina, and the two discussed possible arrangements with the University for Mrs. Campbell's home and long-term care. Mr. Upchurch also answered Mrs. Campbell's questions regarding revocable trusts and other estate planning documents. Between 1986 and 1988, officials from the University (primarily Mr. Upchurch) called Mrs. Campbell and gave her small gifts, honors, and awards, thereby creating what Mr. Upchurch described as a "continuing cultivation of relationship."

Mrs. Campbell had been contemplating a move to North Carolina since approximately 1986. After her husband's death, she no longer had family in Florida, and she also became dissatisfied with the changes occurring in her neighborhood. Her family members in North Carolina had been urging her to move back to the state since 1984. Some family members, including Mrs. Campbell's sister Ruth Bulluck and her niece Ruth Meissner, asked Mrs. Campbell to live with them. Mrs. Campbell refused and expressed her desire to live on her own and not be a burden to anyone. Mrs. Campbell flew to North Carolina, rented a car, and looked at properties on her own. On another occasion, she and Ruth Meissner drove around Fayetteville, Dunn, and surrounding areas to look for suitable property. Mrs. Campbell also considered moving to the family farm in Duplin County, but ultimately decided against it. After weighing all the factors, Mrs. Campbell chose to live on property adjacent to Campbell University. However, she remained in Miami until July 1988, where she wrapped up her affairs, handled the sale of her Miami home, and prepared for her move to North Carolina.

In January 1988, Mrs. Campbell told Mr. Upchurch of her finalized plans to move to Buies Creek, as well as her opinions regarding arrangements between herself and Campbell University. Mrs. Campbell also told Mr. Upchurch she wanted to visit an attorney to prepare necessary estate planning documents. Mr. Upchurch informed her there were several attorneys in the nearby cities of Lillington and Dunn, including William A. Johnson, a general practitioner in Lillington. Campbell University was one of Mr. Johnson's regular clients. Though Mr. Johnson served as "General Counsel" for the University, he was paid for his work on a case-by-case basis, rather than a retainer system. Mrs. Campbell asked Mr. Upchurch to make an appointment for her to see Mr. Johnson, which he did. On

**IN RE WILL OF CAMPBELL**

[155 N.C. App. 441 (2002)]

4 January 1988, Mr. Upchurch sent Mr. Johnson a memo explaining the types of agreements Mrs. Campbell was interested in and asking Mr. Johnson to prepare proposed documents for the University to discuss with Mrs. Campbell. Mr. Upchurch's memo also informed Mr. Johnson that Mrs. Campbell was planning to make a will, and that "Campbell University will draft a Will for Mrs. Campbell upon her directions."

Mrs. Campbell visited North Carolina for nearly two weeks in January 1988. During that time, she stayed with relatives, but made trips to Campbell University and made decisions pertaining to the construction and location of her house. University employees drove Mrs. Campbell around during this time. Mrs. Campbell also met with Mr. Johnson to redraft her will and make other arrangements with the University. She asked Mr. Upchurch to accompany her to the meeting and asked him to stay with her during the actual discussion. During the meeting, both Mr. Upchurch and Mr. Johnson apprised Mrs. Campbell of Mr. Johnson's ties to the University. Mrs. Campbell indicated she understood, and proceeded to use Mr. Johnson as her attorney. Mrs. Campbell gave Mr. Johnson a typed list which described how she wanted her property to be divided upon her death. Mr. Johnson also discussed lapsed bequests and inheritance tax issues. Mrs. Campbell did not consult with Mr. Johnson regarding how to dispose of her property and did not ask him to provide any estate planning service beyond the drafting of the will. Mr. Johnson, Mr. Upchurch, and Mrs. Campbell agreed that Mr. Johnson would bill the University for his services.

Thereafter, Mr. Johnson drafted the will in accordance with Mrs. Campbell's instructions. Mrs. Campbell reviewed the document, but made no changes. The will contained bequests to several nieces and nephews, two sisters, and bequests of $25,000.00 to each of two charities. It also included a bequest of $100,000.00 to a trust for Mrs. Campbell's sister, Marie Baars. Campbell University was named as the residual beneficiary and executor. On 25 January 1988, Mr. Upchurch drove Mrs. Campbell to a bank in Lillington to execute her will. Mrs. Campbell and her witnesses appeared before a notary and made the will self-proving. The total value of the estate disposed of by the will was less than $350,000.00. The remainder of Mrs. Campbell's assets (about $1,000,000.00) was governed by the terms of the Florida trust she had created in 1985.

When Mrs. Campbell returned to Miami in late January 1988, she took with her a number of house plans, as well as drafts of the pro-

posed contracts with the University. A few days later, she contacted Mr. Upchurch and told him she wanted to revoke the Florida trust. Mr. Upchurch discussed the matter with Mr. Johnson, who advised him to prepare a revocation letter for Mrs. Campbell. Mr. Upchurch subsequently took the letter to Florida, where Mrs. Campbell reviewed it, signed it before a notary, and mailed it to her Florida trust officer, Mr. Dave Couch. Mr. Couch contacted Mr. Upchurch for information regarding the relationship between Mrs. Campbell and the University. On 17 February 1988, Mr. Upchurch sent Mr. Couch a letter describing two University trusts into which the Florida trust assets would be transferred, if Mrs. Campbell approved. On 29 February 1988, the trust officer wrote a letter revoking the trust and sent the letter to Mrs. Campbell for her signature.

Within the next several months, Mrs. Campbell executed a number of documents. Each document was prepared by Mr. Johnson and executed by Dr. Norman A. Wiggins, the President of Campbell University. On 10 March 1988, Mrs. Campbell executed a Contract and Agreement, in which she agreed to move to Buies Creek, North Carolina, buy or build a home at her own expense, provide for her own living expenses, and pay her nursing home expenses (should they arise). Campbell University agreed to provide her with live-in care at its own expense. On the same date, Mrs. Campbell also executed a Charitable Remainder Annuity Trust Agreement. Under the Agreement, Mrs. Campbell made a deposit of $350,000.00 and the University agreed to pay her $28,000.00 per year in twelve equal monthly installments, beginning 1 May 1988. Upon her death, the remainder of the money was to go to the University for its general purposes. Mrs. Campbell also executed a Revocable Asset Management Trust Agreement on 1 April 1988 and made an initial deposit of over $638,000.00. Mrs. Campbell agreed to allow the University to invest the funds, and the University agreed to provide Mrs. Campbell with quarterly reports, pay all interest and/or principal to her upon her request, and allow the funds to be used to supplement the estate to satisfy specific bequests under Mrs. Campbell's will. Any funds remaining at Mrs. Campbell's death were to go to the University for its general purposes.

Mrs. Campbell spent the spring and early summer of 1988 taking care of her affairs in Miami. In July 1988, officials from Campbell University drove a University-owned truck to Florida, packed Mrs. Campbell's belongings, and settled her into an apartment near the campus while her house was being built in the Keith Hills

Subdivision. The title work associated with Mrs. Campbell's land purchase was done by Mr. Johnson.

On 7 April 1989, Mrs. Campbell executed a power of attorney in favor of Mr. Upchurch and, in the alternative, Dr. Wiggins. Mr. Johnson again handled the preparation of the document. Upon the death of her sister Marie Baars in 1989, Mrs. Campbell was nominated by her relatives (including the caveators in the present action and her other heirs) to serve as executrix of her sister's estate. She did so without incident. On 11 January 1990, Mrs. Campbell executed a codicil to her 1988 will, in which the $100,000.00 originally intended for Marie was instead given to the building fund for the University's School of Law. The codicil expressly ratified and affirmed all other provisions of her 1988 will. Mrs. Campbell executed the codicil in Mr. Johnson's office, and she and her witnesses also took steps to make it self-proving. In return, the University agreed to have a portrait of Mrs. Campbell painted and hung in the law school; a floor in that building was also named for her first husband, Albert Ezell. The University held a banquet and dinner in Mrs. Campbell's honor in July 1990, during which her portrait was unveiled. Several family members attended the banquet, including three of the caveators.

Mrs. Campbell lived in her home in the Keith Hills Subdivision for the next several years. She remained active, alert, and independent through the early 1990s. On 28 November 1990, Mrs. Campbell executed a Deed Reserving a Life Estate for her home; the document deeded the house to Campbell University. In 1993, Mrs. Campbell gave the University a gift of approximately $180,000.00. The power of attorney in favor of Dr. Wiggins was activated on 30 June 1993.

As Mrs. Campbell grew older, University employees increasingly assisted her with her finances, transportation, and daily living needs. Around 1993, Mrs. Campbell began exhibiting some short-term memory loss. Some of Mrs. Campbell's relatives noticed the change, though they disagreed as to the cause of the problem. During a March 1994 visit to the Geriatric Clinic at Duke University, Mrs. Campbell was diagnosed with Alzheimer's Disease; the doctors estimated that she could have suffered from the disease for approximately five years. The doctors also stated that it was necessary for Mrs. Campbell to have someone with her 24 hours a day. In keeping with the previously executed Contract and Agreement, Campbell University maintained a staff of people in Mrs. Campbell's home around the clock. Mrs. Campbell was upset by the constant companionship and informed the University of her unhappiness. Ultimately, however, she

acquiesced and accepted, to an extent, the 24-hour-a-day care provided by her companions. Though Mrs. Campbell's family knew University companions were tending to her around the clock, they were not notified that Mrs. Campbell had been diagnosed with Alzheimer's Disease until sometime after her visit to the Geriatric Clinic in March of 1994.

Mrs. Campbell became noticeably weaker from 1994 to 1996. Her appearance became more unkempt, and she resisted suggestions from her companions and family members to buy new clothing and practice good hygiene. The University companions had some success with Mrs. Campbell, but she continued to argue each time these subjects were broached. During these years, caveators Fred and Carole Baars began inquiring about their aunt's health and financial well-being. They were told by University officials that Mrs. Campbell was being cared for to the best of their ability. In May 1996, Mrs. Campbell fell and broke her hip and was taken to a local hospital. She subsequently died in the hospital on 16 May 1996.

Upon Mrs. Campbell's death, Dr. Wiggins presented her 1988 will and the 1990 codicil to the probate court. The Harnett County Clerk of Superior Court issued Letters Testamentary which appointed Dr. Wiggins, in his capacity as President and Chief Executive Officer of Campbell University, as the executor of Mrs. Campbell's estate. Soon thereafter, Dr. Wiggins took the "Oath of Executor" and has served in that capacity up to the present time.

Caveators filed a *caveat* to Mrs. Campbell's will on 16 May 1999. During discovery, they learned for the first time about some of the documents which Mrs. Campbell had signed and the extent to which Campbell University benefitted from her will and codicil. After discovering this information, caveators filed a civil complaint in Harnett County on 15 June 2000. The complaint alleged that defendants Campbell University, Inc., Norman A. Wiggins (individually and in his capacity as executor of Mrs. Campbell's estate), and William A. Johnson unduly influenced Mrs. Campbell and breached their fiduciary duty to her while acquiring *inter vivos* transfers of her assets in favor of Campbell University.

Defendants Johnson, Wiggins, and Campbell University filed answers which contained both responses to the allegations of the complaint and motions to dismiss. On 7 November 2000, the Harnett County Superior Court filed two orders which dismissed the complaint against defendants Wiggins and Campbell University with prej-

udice, and dismissed the complaint against defendant Johnson with prejudice in its entirety. The dismissals were based upon the statutes of limitations, lack of subject matter jurisdiction, a noncognizable cause of action, and a failure by Fred and Carole Baars to allege misconduct on Wiggins' part in his role as Mrs. Campbell's attorney-in-fact. When Fred and Carole Baars appealed to this Court, we affirmed the trial court's dismissal of their complaint. *Baars v. Campbell Univ., Inc.*, 148 N.C. App. 408, 558 S.E.2d 871 (2002). The Baars' Petition for Rehearing was denied by this Court, and the North Carolina Supreme Court later denied the Baars' Petition for Discretionary Review. *Baars v. Campbell Univ., Inc.*, 355 N.C. 490, 563 S.E.2d 563 (2002).

Caveators pursued their caveat proceeding in Harnett County Superior Court. The parties employed a number of discovery devices, including interrogatories and depositions. On 15 March 2001, Campbell University (the propounder) moved for partial summary judgment on the issue of undue influence as to the will and the codicil. Attached to the motion were a number of supporting affidavits from Campbell University employees and Mrs. Campbell's family members. On 18 April 2001, caveators filed a response in opposition to the University's motion for summary judgment and included supporting affidavits from each caveator, as well as two expert witnesses. Mr. John Huggard, an expert witness on estate planning, opined that the documents comprising Mrs. Campbell's estate plan were not in her best interests and were improperly procured by Campbell University. Mr. Bradley Bodager, an expert on the principles and standards of fundraising, believed Campbell University's actions constituted overreaching and were questionable.

On 24 April 2001, the trial court granted the motion for partial summary judgment and dismissed the *caveat*. Later the same day, the trial court conducted a jury trial to determine whether the documents offered by Campbell University were the valid will and codicil of Mrs. Campbell. As part of its instructions, the trial court instructed the jury that the will and codicil were "executed according to the requirements of law[.]" The jury found that the will and codicil were valid and belonged to Mrs. Campbell. On 25 April 2001, the trial court entered a judgment ordering that the documents be probated in solemn form. Caveators appealed from both the summary judgment order dated 24 April 2001 and the judgment dated 25 April 2001.

On appeal, caveators argue that the trial court committed reversible error by (I) entering summary judgment against them on

the issue of undue influence by the propounder, Campbell University; and (II) instructing the jury that the will and codicil were validly executed. For the reasons set forth herein, we disagree with caveators' arguments and uphold both the order and the judgment of the trial court.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2001). "Where a motion for summary judgment is supported by proof which would require a directed verdict in [the movant's] favor at trial he is entitled to summary judgment unless the opposing party comes forward to show a triable issue of material fact." *In re Will of Edgerton,* 29 N.C. App. 60, 63, 223 S.E.2d 524, 526, *disc. review denied,* 290 N.C. 308, 225 S.E.2d 832 (1976). Summary judgment should be entered cautiously. *Volkman v. DP Associates,* 48 N.C. App. 155, 157, 268 S.E.2d 265, 267 (1980). However, if the party with the burden of proof cannot prove the existence of each essential element of its claim or cannot produce evidence to support each essential element, summary judgment is warranted. *See Development Corp. v. James,* 300 N.C. 631, 638, 268 S.E.2d 205, 210 (1980). "[T]he standard of review on appeal from summary judgment is whether there is any genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law." *Bruce-Terminix Co. v. Zurich Ins. Co.,* 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998).

**[1]** Caveators first argue that partial summary judgment is not authorized in caveat proceedings because the filing of a *caveat* necessitates a probate proceeding in solemn form with a jury trial. Caveators note such a proceeding is *in rem* and believe the Rules of Civil Procedure provide no authority for a judge, rather than a jury, to determine that the will is valid. While it is true that the issue of *devisavit vel non* (a determination of whether the will is valid) must be tried by a jury, *In re Will of Roediger,* 209 N.C. 470, 476, 184 S.E. 74, 77 (1936), it does not follow that partial summary judgment as to other issues (such as undue influence) is prohibited. Our Court has previously upheld grants of partial summary judgment or directed verdict on the issue of undue influence. *See In re Estate of Whitaker,* 144 N.C. App. 295, 547 S.E.2d 853, *disc. review denied,* 354 N.C. 218, 555 S.E.2d 278 (2001); and *In re Will of Sechrest,* 140 N.C. App. 464, 537 S.E.2d 511 (2000), *disc. review denied,* 353 N.C. 375, 547 S.E.2d

16 (2001). Having determined that partial summary judgment is authorized in *caveat* proceedings, we turn to the substantive arguments presented by the parties.

"The purpose of a caveat is to determine whether the paperwriting purporting to be a will is in fact the last will and testament of the person for whom it is propounded." *In re Spinks*, 7 N.C. App. 417, 423, 173 S.E.2d 1, 5, *cert. denied*, 276 N.C. 575 (1970). "The filing of a caveat is the customary and statutory procedure for an attack upon the testamentary value of a paperwriting which has been admitted by the clerk of superior court to probate in common form." *Id.* A direct attack by *caveat* has been held a complete and adequate remedy at law, such that a plaintiff is not entitled to equitable relief. *Johnson v. Stevenson*, 269 N.C. 200, 204, 152 S.E.2d 214, 217 (1967). We further note that "[a]n attack on the validity of a will most commonly deals with issues involving undue influence and testamentary capacity." *Brickhouse v. Brickhouse*, 104 N.C. App. 69, 72, 407 S.E.2d 607, 609 (1991).

### Fiduciary Relationship

[2] By filing a *caveat* to Mrs. Campbell's will and codicil, caveators undertook the burden of proving that undue influence was exerted upon Mrs. Campbell by the propounders. Caveators maintain the University (and its General Counsel, Mr. Johnson) had a fiduciary duty toward Mrs. Campbell which began when she executed the will Mr. Johnson prepared for her. Because of the fiduciary relationship, caveators argue that the University bore the burden of proving, by the greater weight of the evidence, that the transaction was open, fair and honest. Caveators' filing of the caveat and their allegation of a fiduciary relationship result in the following burdens upon the parties:

> In a proceeding to caveat a will, the caveators are required to handle the laboring oar on the issue of undue influence. . . . True, in certain fiduciary relations, if there be dealings between the parties, on complaint of the party in the power of the other, the relation of itself, and without more, raises a presumption of fraud or undue influence, as a matter of law, and annuls the transaction unless such presumption be rebutted by proof that no fraud was practiced and no undue influence was exerted. . . .
>
> . . . It is sufficient to rebut a presumption by evidence of equal weight rather than by a preponderance of the evidence, where

the burden of the issue is on the opposite party. . . . Strictly speaking, the burden of the issue, as distinguished from the duty to go forward with evidence, does not shift from one side to the other, for the burden of proof continues to rest upon the party who alleges facts necessary to enable him to prevail in the cause. It is required of him who thus asserts such facts to establish them before he can become entitled to a verdict in his favor; and, as to these matters, he constantly has the burden of the issue, whatever may be the intervening effect of different kinds of evidence or of evidence possessing under the law varying degrees of probative force.

*In re Will of Atkinson*, 225 N.C. 526, 530-31, 35 S.E.2d 638, 640-41 (1945) (citations omitted). Stated another way,

"The burden of the issue—that is, the burden of proof in the sense of ultimately proving or establishing the issue or case of the party upon whom such burden rests, as distinguished from the burden of duty of going forward and producing evidence—never shifts, but the burden or duty of proceeding or going forward often does shift from one party to the other, and sometimes back again. Thus, when the actor has gone forward and made a *prima facie* case, the other party is compelled in turn to go forward or lose his case, and in this sense the burden shifts to him. So the burden of going forward may, as to some particular matter, shift again to the first party in response to the call of a *prima facie* case or presumption in favor of the second party. But the party who has not the burden of the issue is not bound to disprove the actor's case by a preponderance of the evidence, for the actor must fail if upon the whole evidence he does not have a preponderance, no matter whether it is because the weight of evidence is with the other party or because the scales are equally balanced."

*Winslow v. Hardwood Co.*, 147 N.C. 275, 277, 60 S.E. 1130, 1131 (1908) (quoting 1 Elliott on Evidence, 139).

The law is well settled that in certain known and definite "fiduciary relations, if there be dealing between the parties, on the complaint of the party in the power of the other, the relation of itself and without other evidence, raises a presumption of fraud, as a matter of law, which annuls the act unless such presumption be rebutted by proof that no fraud was committed, and no undue influence or moral duress exerted." *Lee v. Pearce*, 68 N.C., 76. Among these, are, . . . (2) attorney and client, in respect of the matter wherein the relationship exists . . . .

**IN RE WILL OF CAMPBELL**

[155 N.C. App. 441 (2002)]

"When one is the general agent of another, who relies upon him as a friend and adviser, and has entire management of his affairs, a presumption of fraud, as a matter of law, arises from a transaction between them wherein the agent is benefited, and the burden of proof is upon the agent to show by the greater weight of the evidence, when the transaction is disputed, that it was open, fair and honest." *Smith v. Moore* (7th syllabus), 149 N.C., 185, 62 S.E., 892 [1908].

*McNeill v. McNeill*, 223 N.C. 178, 181, 25 S.E.2d 615, 616-17 (1943); *see also In re Will of Amelia Everett*, 153 N.C. 83, 68 S.E. 924 (1910).

The University has admitted that it had a fiduciary responsibility to Mrs. Campbell as of 10 March 1988, a date that fell after the execution of the will, but before the execution of the codicil. The University also admitted that Mr. Johnson had a fiduciary relationship with Mrs. Campbell with respect to the drafting of her will. However, the University denied that it had a fiduciary relationship with Mrs. Campbell as of 25 January 1988 (the date the will was executed).

Even if we agree that a fiduciary relationship between Mrs. Campbell and the University existed as of the date her will was executed—25 January 1988—we believe the University has offered sufficient evidence to rebut the presumption of undue influence and has shown that the transaction was open, fair, and honest. Mrs. Campbell freely discussed her estate planning concerns with Mr. Upchurch and inquired about possible arrangements between herself and the University. Though Mr. Johnson served as General Counsel for Campbell University at the time he drafted Mrs. Campbell's will and codicil, his relationship to the University was fully explained to Mrs. Campbell by both Mr. Upchurch and Mr. Johnson. Mrs. Campbell indicated she understood, but chose to use Mr. Johnson as her attorney. Mr. Upchurch's involvement in the meeting between Mrs. Campbell and Mr. Johnson was expressly requested by Mrs. Campbell. Mrs. Campbell asked Mr. Johnson to prepare all the documents she eventually signed, and he did so at her request. Though the University paid Mr. Johnson for drafting Mrs. Campbell's will, Mrs. Campbell was aware of the arrangement and agreed to it. Before going to the meeting with Mr. Johnson in January 1988, Mrs. Campbell considered bequests she wanted to make and gave Mr. Johnson a list of her decisions. Even though the list was probably typed by someone in the Advancement Office at Campbell University, it represented Mrs. Campbell's wishes for the distribution of her estate upon her death.

Finally, though caveators seek to cast doubt upon the quality of advice and representation given to Mrs. Campbell by Mr. Johnson and the University, we do not believe these arguments are persuasive. Mr. Johnson drafted Mrs. Campbell's will based on his discussions with her and the list of bequests she wished to make. Caveators also point to the changes between Mrs. Campbell's 1984 and 1988 wills and have speculated as to why Mrs. Campbell changed or eliminated bequests from her earlier will. However, the University has come forward with sufficient evidence showing that Mrs. Campbell was aware of Mr. Johnson's relationship with the University; that she nonetheless wanted to use him as her attorney, and did so; and that her wishes were reflected in the will and all the other estate planning documents prepared for her by Mr. Johnson.

Based upon the record, we hold the University carried its burden of proving that its fiduciary relationship with Mrs. Campbell was open, fair, and honest. We therefore turn to the central issue presented by this appeal; namely, whether Mrs. Campbell was unduly influenced by the propounder.

## Undue Influence

**[3]** To prevent partial summary judgment against them on the issue of undue influence, caveators had to prove the existence of "(1) a person who is subject to influence; (2) an opportunity to exert influence; (3) a disposition to exert influence; and (4) a result indicating undue influence." *In re Will of Dunn*, 129 N.C. App. 321, 328, 500 S.E.2d 99, 104 (quoting *Griffin v. Baucom*, 74 N.C. App. 282, 286, 328 S.E.2d 38, 41, *disc. review denied*, 314 N.C. 115, 332 S.E.2d 481 (1985)), *disc. review denied*, 348 N.C. 693, 511 S.E.2d 645 (1998). Caveators assert that they have proven the four elements of undue influence. We recognize that

> [b]ecause the existence of undue influence is usually difficult to prove, our courts have recognized that it must usually be proved by evidence of a combination of surrounding facts, circumstances and inferences from which a jury could find that the person's act was not the product of his own free and unconstrained will, but instead was the result of an overpowering influence over him by another.

*Dunn*, 129 N.C. App. at 328, 500 S.E.2d at 104. *See also In the Matter of the Will of Everhart*, 88 N.C. App. 572, 574, 364 S.E.2d 173, 174, *disc. review denied*, 322 N.C. 112, 367 S.E.2d 910 (1988). The influ-

ence exerted upon Mrs. Campbell had to be "of a kind which operates on the mind of the testator at the very time the will is made, and causes its execution." *In re Will of Thompson,* 248 N.C. 588, 593, 104 S.E.2d 280, 284 (1958). Moreover, caveators had to prove that each time an instrument was executed, *undue* influence was exerted upon Mrs. Campbell. For influence to be undue,

> "there must be something operating upon the mind of the person whose act is called in judgment, of sufficient controlling effect to destroy free agency and to render the instrument, brought in question, not properly an expression of the wishes of the maker, but rather the expression of the will of another. It is the substitution of the mind of the person exercising the influence for the mind of the testator, causing [her] to make a will which [she] otherwise would not have made. (citations omitted)."

*In re Will of Prince,* 109 N.C. App. 58, 61, 425 S.E.2d 711, 713-14 (1993) (quoting *In re Will of Kemp,* 234 N.C. 495, 498, 67 S.E.2d 672, 674 (1951)). Undue influence has also been described as

> "a fraudulent influence, or such an overpowering influence as amounts to a legal wrong. It is close akin to coercion produced by importunity, or by a silent, resistless power, exercised by the strong over the weak, which could not be resisted, so that the end reached is tantamount to the effect produced by the use of fear or force. To constitute such undue influence, it is not necessary that there should exist moral turpitude, but whatever destroys free agency and constrains the person, whose act is brought in judgment, to do what is against his or her will, and what he or she otherwise would not have done, is a fraudulent influence in the eye of the law."

*In re Will of Harris,* 218 N.C. 459, 461, 11 S.E.2d 310, 311 (1940) (citations omitted) (quoting *In re Will of Turnage,* 208 N.C. 130, 179 S.E. 332 (1935)).

Our Supreme Court has identified seven factors that are probative on the issue of undue influence:

1. Old age and physical and mental weakness of the person executing the instrument.

2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision.

3. That others have little or no opportunity to see him.

4. That the instrument is different and revokes a prior instrument.

5. That it is made in favor of one with whom there are no ties of blood.

6. That it disinherits the natural objects of his bounty.

7. That the beneficiary has procured its execution.

*Hardee v. Hardee*, 309 N.C. 753, 756-57, 309 S.E.2d 243, 245 (1983); *see also In re Andrews*, 299 N.C. 52, 55, 261 S.E.2d 198, 200 (1980). "[T]he caveator need not prove the existence of every factor. However, the caveator must present sufficient evidence to make out a *prima facie case*." *In re Estate of Forrest*, 66 N.C. App. 222, 225, 311 S.E.2d 341, 343, *aff'd*, 311 N.C. 298, 316 S.E.2d 55 (1984).

As to the first factor, caveators point to the fact that Mrs. Campbell was 81 years old when she signed her will, and 83 years old when she signed the codicil. They also argue that she may have been suffering from Alzheimer's Disease when she executed those documents. According to caveators, Mrs. Campbell was lonely and vulnerable in Florida when she first met Campbell University employees and lacked the ability to handle and understand complicated legal and financial documents. Caveators also believe Mrs. Campbell could have been easily influenced and felt overwhelmed by her financial situation, as evidenced by her 1986 call to her nephew Davis Bulluck for assistance with her finances.

With regard to the second factor, caveators point to the frequent association and supervision of Mrs. Campbell by agents of the University. Caveators trace the association from Mrs. Campbell's January 1988 visit to North Carolina, through her move to Buies Creek in July 1988, and onward until her death on 16 May 1996. They further believe that Mrs. Campbell was in the company of Mr. Upchurch "at every critical step of the way[.]"

With regard to factor three, caveators argue that, even though they were able to visit Mrs. Campbell in her home in Buies Creek, there was "almost always" a Campbell University representative present during the visits. For this proposition, caveators rely on testimony from Mrs. Campbell's relatives.

As to factors four and five, caveators point to the differences between Mrs. Campbell's 1984 and 1988 wills. They also note that the 1988 will was made in favor of one with no blood ties to Mrs. Campbell, *i.e.*, the University.

## IN RE WILL OF CAMPBELL

[155 N.C. App. 441 (2002)]

As to factor six, caveators maintain the 1988 will and codicil effectively disinherited the natural objects of Mrs. Campbell's bounty—namely, blood relatives and relatives by marriage. They argue there was no change in any of their relationships with Mrs. Campbell between 1984 and 1988; thus, they believe the only explanation for the differences in the two wills was undue influence exerted by the University upon Mrs. Campbell. Caveators also point to the affidavits of Emerson Campbell and his wife Edith and a letter written by one of Mrs. Campbell's sisters; these individuals believed Mrs. Campbell did not understand the legal effects of the documents she signed, particularly with regard to ownership of her home in the Keith Hills Subdivision.

Lastly, with regard to factor seven, caveators argue the 1988 will was procured by Campbell University, the primary beneficiary. In sum, caveators believe their evidence would permit a jury to infer that the will and the other documents signed by Mrs. Campbell were not the result of her free will, but rather the intent of Campbell University. Thus, they believe summary judgment was precluded as a matter of law.

While caveators have made the arguments set forth above, we do not believe they have carried their burden of proving undue influence. Specifically, caveators have failed to show that Mrs. Campbell was susceptible to undue influence when she executed her will in 1988 and her codicil in 1990. Our case law has noted that the mental condition of a testator at the time he or she makes a will or codicil is " 'perhaps, the strongest factor leading to the answer to the [fraud and undue influence] issue.' " *In re Will of Ricks*, 292 N.C. 28, 37-38, 231 S.E.2d 856, 863 (1977) (quoting *Goins v. McLoud*, 231 N.C. 655, 658, 58 S.E.2d 634, 637 (1950)). Without evidence that the testator is susceptible to fraud or undue influence, evidence of undue influence itself is often too tenuous for consideration. *Id.* at 37, 231 S.E.2d at 863.

The evidence of record indicates that Mrs. Campbell possessed a sharp mind, a quick wit, and a good sense of humor. She was physically healthy through the late 1980s and early 1990s, as evidenced by the fact that she traveled great distances on her own and managed her own business, personal, and financial affairs. Mrs. Campbell was opinionated and made her wishes known to those with whom she dealt. She was quite active and many people had the opportunity to see her. Those that did see her described her as "spunky," "sharp," "mentally alert," "intelligent," "competent," "prudent," "strong-

willed," and "level-headed." Mrs. Campbell deliberated for some time over her move to North Carolina and considered several possible relocation sites before settling down in Buies Creek. Even though several close relatives asked her to move in with them, Mrs. Campbell refused and expressed her desire to live on her own and remain independent as long as she could. Her close family relatives, including Mrs. Meissner and Mr. Bulluck, knew some of the details of Mrs. Campbell's dealings with Campbell University, but trusted her to make her own decisions and expressed no concern regarding the agreements Mrs. Campbell was contemplating.

Mrs. Campbell had a lifetime of dealing with complex financial issues. She was the primary breadwinner during her first marriage to Albert Ezell and dealt with business and personal matters after the death of her second husband, Harold Campbell. Even though she called her nephew Davis Bulluck for assistance in 1986, he ultimately concurred with her belief that her bank was withholding money it owed to her. Mrs. Campbell also served as executrix of her sister Marie Baars' estate after Marie died in 1989; none of the caveators ever objected to her handling of Marie's estate. Significantly, this date occurred over a year after Mrs. Campbell executed her will.

Though caveators argue Mrs. Campbell was in the custody of and subject to the "constant" association of representatives from Campbell University for a number of years, this argument does not reflect the entire scenario then taking place. The record and affidavits indicate Mrs. Campbell made three visits to the University between June 1987 and January 1988, and that Mr. Upchurch visited her in Miami in April 1987. Mrs. Campbell made an additional visit with Mrs. Meissner to the University for Homecoming in October 1987; a few days later, Mrs. Campbell, Mrs. Meissner, and Mr. and Mrs. Upchurch went to the Outer Banks for a short visit.

Mrs. Campbell spent the remainder of her time from 1986-1988 in Miami, where she continued to manage her affairs and conduct her life as she saw fit. During 1988, Mrs. Campbell made one trip in January to execute her will and moved to Buies Creek for good in July. Between January and July 1988, Mr. Upchurch visited Miami for one day and later made a brief unofficial visit with his wife while they were vacationing in Florida. Once Mrs. Campbell moved to North Carolina, University employees checked on her and drove her around as needed. However, part-time companions were not employed until after the codicil was executed in early 1990, and full-time companions did not begin staying with Mrs. Campbell until March 1994. Thus, it

appears Mrs. Campbell was not under anyone's custody or supervision when she executed her will and codicil. We also discern no instances in which Mrs. Campbell's family was prevented from seeing her and communicating with her. In fact, when Mrs. Campbell moved to Buies Creek, caveators had opportunities to see her and did so on numerous occasions.

We also note that caveators had little to do with Mrs. Campbell over the years, especially while she lived in Florida. Mrs. Campbell told others that only Mrs. Meissner cared about her and tried to find out if she needed anything; she did not say the same about any of the caveators. Though Emerson Campbell and his wife kept in touch with Mrs. Campbell around once a year, they did not visit her for many years after Harold Campbell died; moreover, the main purpose of their one visit to North Carolina was to retrieve a china cabinet Mrs. Campbell agreed to give them. Over time, they assumed she was dead, while she was in fact alive and living in North Carolina. When Mrs. Campbell moved to Buies Creek, caveators had opportunities to see her; the fact that they did not see her more frequently was not the University's doing.

We believe caveators failed to present specific facts showing that Mrs. Campbell's will and codicil were executed solely as a result of fraudulent and overpowering influence by Campbell University that controlled Mrs. Campbell at the time she executed the documents. *See Whitaker*, 144 N.C. App. at 299-302, 547 S.E.2d at 857-59. Upon review, caveators' evidence appears to be comprised of conclusions rather than statements of fact. As such, they do not assist caveators in carrying their considerable burden.

We note that mere opportunity to exert undue influence does not prove its existence; rather, the effects must be evident in the documents. The University argues, and we agree, that caveators' evidence of procurement was not sufficient to establish undue influence and did not preclude summary judgment on that issue. While we appreciate the difficulties inherent in undue influence cases, we are guided by past decisions of this Court where stronger evidence than that presented by caveators was still deemed insufficient to prove undue influence. *See In re Will of Prince*, 109 N.C. App. 58, 425 S.E.2d 711; and *In re Will of Sechrest*, 140 N.C. App. 464, 537 S.E.2d 511.

Before meeting with Mr. Johnson, Mrs. Campbell made a list of bequests she wanted to make to two charities and a number of her relatives. Mr. Johnson formalized her wishes into the 1988 will. When

Mrs. Campbell's sister Marie died in 1989, Mrs. Campbell considered what to do with the money she had set aside for Marie and ultimately decided to execute a codicil bequeathing the money to the University's Law School Building Fund.

Mrs. Campbell had an absolute right to disinherit anyone she chose. *In re Will of Edgerton*, 29 N.C. App. at 63, 223 S.E.2d at 527; *Kidder v. Bailey*, 187 N.C. 505, 507, 122 S.E.2d 22, 23 (1924). Moreover, a will is not void if it has been obtained by fair argument or persuasion, even if an unequal disposition of the testator's property is the end result. *See In re Will of Franks*, 231 N.C. 252, 260, 56 S.E.2d 668, 675 (1949), *reh'g denied*, 231 N.C. 736, 57 S.E.2d 315 (1950). "It is not necessary that the testator should be able to dispose of his property with judgment and discretion—wisely or unwisely, for he may do with his own as he pleases; but it is enough if he understands the nature and effect of his act and knows what he is about." *In re Craven*, 169 N.C. 561, 567, 86 S.E.2d 587, 591 (1915). Caveators cannot prove undue influence, so long as Mrs. Campbell understood the nature and effect of her acts and what she was about to do when she executed her will and codicil.

The fact that Mrs. Campbell's 1984 and 1988 wills were different does not, without more, show that the 1988 will was the product of undue influence. Likewise, the facts that the 1988 will benefits one with whom Mrs. Campbell had no blood ties (*i.e.*, the University) cannot alone show undue influence. Given Mrs. Campbell's relationship with her relatives and the fact that they were not the direct sort of "natural objects of her bounty," we cannot say the will and codicil were unnatural or irrational.

When Mrs. Campbell executed her 1984 will, she had only been widowed for two months and her husband's estate had not been administered. She made bequests to two charities, her brother-in-law, and several relatives. By 1988, she was not particularly close to any of her nieces and nephews, except Mrs. Meissner. Despite this fact, all individual bequests in her 1988 will were to blood relatives and included her sisters, nieces and nephews. The 1984 will did not provide for all her blood relatives. While she had a warm relationship with her brother-in-law Emerson Campbell and his wife during Harold Campbell's lifetime, she saw less of Emerson and Edith Campbell after Harold's death, and he was not a blood relative. The evidence indicates Mrs. Campbell was especially fond of her sister Marie and was concerned about her well-being. Her concern over Marie was evidenced by the fact that the 1984 will gave her $5,000.00, while the

IN RE WILL OF CAMPBELL

[155 N.C. App. 441 (2002)]

1988 will increased the bequest to $100,000.00. Indeed, all the individual beneficiaries in the 1988 will were blood relatives.

Mrs. Campbell's interest in charity was evident in both her 1984 and her 1988 wills. Mrs. Campbell was impressed by the University and believed it "was really a good place and doing really good things." Mrs. Campbell appreciated the University's acknowledgment of her gifts and contrasted that response to those of her relatives, who were more distant in· their communications with her. Mrs. Campbell confided to some people that her relatives were not very interested in her life and that she had negotiated a good arrangement with Campbell University for her care. She stated that she wanted the University to have what she had, and her 1988 will and codicil reflected that testamentary intent. We hold caveators have failed to carry their burden of showing undue influence upon Mrs. Campbell by Campbell University. Accordingly, caveators' first assignment of error is overruled.

## Peremptory Jury Instruction

[4] By their second assignment of error, caveators argue the trial court erred by instructing the jury that the will and codicil were duly executed. Again, we disagree.

At trial, the propounder called all the witnesses to Mrs. Campbell's will and codicil, as well as the notaries who took down the acknowledgments. Although the trial took place a decade after the execution of the documents, the witnesses presented uncontroverted testimony that all statutes governing the execution of wills and codicils were complied with by Mrs. Campbell and her witnesses. Both the will and the codicil were self-proving. Caveators presented no contrary evidence to the jury.

We have carefully reviewed the record and conclude the trial court properly instructed the jury on this issue, as competent, uncontroverted evidence of proper execution of both documents was presented. See N.C. Gen. Stat. §§ 31-3.3 and 31-11.6 (2001). This assignment of error is therefore overruled.

Upon thoughtful review of the record and the arguments presented by the parties, we conclude the trial court did not err in granting partial summary judgment on the issue of undue influence and did not err in its instruction to the jury regarding the execution of the will and the codicil. The trial court's order granting partial summary judgment for Campbell University on the issue of undue influ-

ence is affirmed. We discern no error in the trial court's instruction to the jury and in the jury's verdict finding the proffered will and codicil to be the valid will and codicil of Gladys Baars Campbell.

As to order entered 24 April 2001—affirmed.

As to judgment entered 25 April 2001—no error.

Judges WALKER and BRYANT concur.