IN THE MATTER OF THE WILL OF MARY O. McDONALD, DECEASED

No. COA02-472

(Filed 4 March 2003)

## 1. Wills— caveat—duress and undue influence—directed verdict—judgment notwithstanding the verdict—motion for new trial

The trial court did not err in a will caveat action alleging the will was obtained through duress and undue influence by denying propounder's motions for directed verdict, judgment notwithstanding the verdict, and for a new trial even though propounder was not present during the negotiation and execution of the will, because there was more than a scintilla of evidence from which the jury could reasonably find the existence of the four elements of undue influence including that: (1) decedent, in the weeks following her daughter's death and leading up to the execution of the will, was a person who was subject to influence; (2) propounder, who suddenly became wholly involved in decedent's affairs, had an opportunity to exert influence over decedent; (3) propounder, who among other things directly solicited decedent's financial consultant for assistance in persuading decedent not to involve her nephew with the will, had a disposition to exert influence; and (4) the result indicates the presence of undue influence.

## 2. Evidence— will caveat—sale of trucking business—motive—untruthfulness

The trial court did not abuse its discretion in a will caveat action alleging the will was obtained through duress and undue influence by denying propounder's motion in limine and by admitting evidence regarding propounder's sale of her trucking business even though propounder contends the evidence was impermissibly admitted to show her character for untruthfulness, because: (1) the trial court specifically found information regarding the sale of propounder's trucking business was relevant and that its probative value would not be outweighed by the danger of unfair prejudice; (2) propounder told other witnesses and testified in her deposition that the sale of her trucking business was the reason she announced her retirement days prior to execution of the will, and caveator sought to prove this reason as untruthful to establish a pattern of deceit surrounding the will and to

IN RE WILL OF McDONALD

[156 N.C. App. 220 (2003)]

show propounder knew she was to be named the primary benefi-ciary and was motivated to conceal this fact from others who might raise questions about her retirement and the will; and (3) even if admitted in error, this evidence was not prejudicial in light of other evidence of instances of propounder's untruthfulness and the testimony of several witnesses as to her general reputa-tion in the community as untrustworthy.

### 3. Wills— caveat—undue influence—jury instructions

The trial court did not err in a will caveat action alleging the will was obtained through duress and undue influence by instructing the jury that it could consider on the issue of undue influence whether decedent was subjected to misrepresentations regarding the wishes of her natural children, whether propounder obtained other transfers of property from decedent, and whether propounder was disposed to exert undue influence, because: (1) a trial court may instruct the jury as to claims or defenses that are supported by the evidence when viewed in the light most favor-able to the proponent of the instruction; and (2) each instruction in the present case was amply supported by the evidence and was relevant to the issue of undue influence.

### 4. Evidence— opinion—will caveat—susceptibility to influence

The trial court did not err in a will caveat action alleging the will was obtained through duress and undue influence by permit-ting decedent's financial advisor to testify as to his opinion that he could have swayed decedent in making decisions had he so desired, because: (1) the testimony was rationally based on the financial advisor's perception of decedent over the course of many dealings with her and was also helpful to a determination of a fact in issue of whether decedent was susceptible to influ-ence in the time leading to the execution of her will; and (2) not only was there ample testimony from other witnesses about dece-dent's susceptibility to undue influence, but propounder's coun-sel later yielded essentially the same statement from the financial advisor on cross-examination thereby precluding objection from propounder and rendering any error harmless.

### 5. Costs— will caveat—attorney fees

The trial court did not err in a will caveat action alleging the will was obtained through duress and undue influence by denying propounder's motion for attorney fees and costs, because: (1) although N.C.G.S. § 6-21 requires the trial court to make a finding

IN RE WILL OF McDONALD

[156 N.C. App. 220 (2003)]

of fact that the proceeding had substantial merit prior to award-ing attorney fees to the caveator, the statutes does not require any such findings in the case of a propounder; and (2) a trial court's decision whether to award attorney fees and costs to a propounder under N.C.G.S. § 6-21 is within its sound discre-tion, and there was no abuse of discretion given the jury's ver-dict that the will was procured through propounder's exertion of undue influence.

Appeal by propounder from judgment entered 1 June 2001 and order entered 28 June 2001 by Judge Melzer A. Morgan, Jr., in Moore County Superior Court. Heard in the Court of Appeals 29 January 2003.

*Katherine E. Jean for propounder-appellant.*

*West & Smith, LLP, by Stanley W. West, for caveator-appellee.*

MARTIN, Judge.

Mary O. "Quill" McDonald died 23 February 1999. On 17 March 1999, Vickie S. Calcutt presented for probate a paper writing pur-porting to be McDonald's Last Will and Testament. The paper writing named Calcutt as primary beneficiary. On 9 August 2000, McDonald's son, James C. McDonald, filed a caveat to the will, alleging the exe-cution of the will was obtained through duress and undue influence.

The evidence tended to show that McDonald had two children, Mary Louise McDonald and James McDonald, the caveator in this action. McDonald's husband and father of her children died in 1989. At the time, and at all relevant times, caveator lived in Asheville and had limited contact with his mother, who resided in Southern Pines. In 1995, after living away from her mother for several years, Mary Louise moved back to Southern Pines to live with McDonald, who was then approximately 84 years old. Various relatives and friends testified McDonald became "totally reliant" and dependent upon Mary Louise, and that McDonald would do as Mary Louise directed. In July of 1997, Mary Louise became ill and died suddenly. Lilla Williams, McDonald's niece, testified McDonald was "devastated" by Mary Louise's death. Jean Cameron, a relative and close friend of McDonald's who had been around her on a weekly basis for some 40 years, testified Mary Louise's death came as a shock to McDonald, who was then 86 years old. McDonald moved into Cameron's home for a short time after the death.

Cameron testified that despite having known McDonald virtually all her life, she had never heard propounder's name until just prior to Mary Louise's death. McDonald's next door neighbor, who was generally aware of any visitors to McDonald's house, testified he had never seen propounder until Mary Louise's funeral. Lilla Williams testified that prior to Mary Louise moving back to Southern Pines, propounder was not at all significant in McDonald's life, and in fact, McDonald "didn't care for [propounder] or her family." Linda Laverdure and Agnes Davis, nieces of McDonald, both testified they were around McDonald often for many years, and that McDonald did not associate with propounder until Mary Louise returned to Southern Pines. Davis testified propounder only became very involved in McDonald's life following Mary Louise's death.

Cameron testified that in the weeks following Mary Louise's death, and about the time she first noticed propounder's involvement with McDonald, she observed "a definite change" in McDonald's personality. Whereas McDonald had typically been "feisty" and formed her own opinions, she was now "very submissive to any suggestions or planning." Cameron noticed propounder was constantly "directing [McDonald] what to do," was "very much in charge," and that McDonald was "very submissive" to everything propounder instructed. Cameron also observed that in order to direct McDonald what to do, propounder "repeatedly" and continually told McDonald "this is what Mary Louise would have done" or "this is what Mary Louise would have liked for you to do." Cameron testified these statements always had a significant impact on McDonald, who would then completely and uncharacteristically submit to whatever propounder had suggested as being Mary Louise's desire.

Cameron's testimony was corroborated by several other witnesses close to McDonald. Laverdure testified that after Mary Louise's death, propounder "stepped into" Mary Louise's role of directing McDonald and making decisions for her. Williams also observed propounder "several times" directing McDonald what to do by stating it was what Mary Louise would have wanted, and that propounder told McDonald that Mary Louise had given her specific instructions to look after McDonald should Mary Louise die, but that she "could only look after her if [McDonald] gave her the means to do it."

In addition, Cameron testified that during the weeks after Mary Louise's death, McDonald was taking several medications and was easily confused by what she needed to take and when, such that

Cameron was required to monitor her. Cameron further testified she tried to explain to McDonald how to use household items such as the microwave, but McDonald was incapable of understanding. Cameron had to assist McDonald with such things as bathing. Also during this time, Cameron routinely drove McDonald to her own home to pick up her mail, and propounder would accompany them. Cameron testified that while in McDonald's house, she observed propounder going through papers which Cameron believed to be Mary Louise's financial documents.

Caveator also presented the testimony of Mike Haney, a financial consultant who performed services for McDonald. Haney testified McDonald contacted him shortly after Mary Louise's death in July 1997. McDonald requested that Haney take her to see Robert Page, an attorney. Haney did so, and the three briefly discussed the drafting of a will for McDonald. Haney testified that in discussing potential beneficiaries, the only name McDonald mentioned was Norman Paschal, a blood nephew who resided in Atlanta and had assisted in caring for McDonald's older sister. According to Cameron, Paschal was the first person McDonald wished to contact after Mary Louise's death. Propounder's name was never mentioned in that meeting.

After that meeting, Haney testified McDonald requested that he come to her house on a weekly basis to assist her. Throughout this time, Haney observed about McDonald a "dependency on someone to point the direction specifically" and stated he believed he could have persuaded her or pushed her in making decisions had he so desired. On one such meeting at McDonald's house, Haney met propounder. Haney testified that when he was leaving that day, propounder followed him out to his car and told him it was obvious McDonald trusted him, and that "[w]e really don't need this nephew in Atlanta involved in this. We're a family up here; we can take care of it." Haney was taken aback by propounder's statements, and did not respond.

McDonald also sought financial services from Blanchard Granville following Mary Louise's death. Granville met with McDonald several times regarding her financial investments. Granville testified propounder was present for all his meetings with McDonald, including those at which the beneficiary designations on McDonald's investments were changed from Mary Louise to propounder. Granville testified propounder did most of the talking during these meetings, and that McDonald was "very, very quiet" and obviously "depressed."

**IN RE WILL OF McDONALD**

[156 N.C. App. 220 (2003)]

In mid-September 1997, roughly two months after Mary Louise's death and one month prior to execution of the will, McDonald moved from Cameron's home to a retirement home. Cameron testified she visited McDonald in her room one evening shortly after the move. When Cameron returned home that evening, she received a telephone call from propounder, who told her McDonald had complained about Cameron's visit. Cameron was surprised, because McDonald never gave any indication she was not welcome to visit and McDonald was pleasant for the duration of the visit. As a result, Cameron did not visit McDonald in the retirement home until some time later upon receiving a telephone call from a relative of McDonald's asking her why she had not been visiting McDonald. Cameron relayed what propounder had told her, but the relative dismissed it as untrue. When Cameron visited McDonald shortly thereafter, McDonald was equally perplexed as to why Cameron had not been visiting.

Williams testified that shortly after McDonald's move into the retirement home, McDonald complained to her that she was not able to place long-distance telephone calls from the telephone in her room. Propounder suggested it was likely a problem with the telephone itself, but when Williams tested another telephone in McDonald's room, she could not make a long-distance call. Larry Furr, a telephone company representative, testified McDonald's telephone number was registered to McDonald, care of propounder, and that when the telephone service was established in September 1997, a block was placed on the telephone that would prohibit any long-distance calls from being made from that telephone. Furr testified such a block would have had to have been specifically requested, because there was an additional monthly charge for the block. Furr also testified the monthly bills for McDonald's telephone were mailed to propounder.

Sometime in September 1997, just prior to execution of McDonald's will, propounder announced she was ceasing her child care business effective the end of October 1997. Williams testified propounder told her she had sold some trucks from a trucking business she owned and had enough money that she would no longer need to work. Propounder also testified in her deposition that the sale of some trucks was the reason she no longer needed to work. Propounder later retracted that statement and subsequently testified the real reason she no longer needed to work was because of a "secret agreement" she had to provide trucking services to the United States government, and that the government paid her $160,000 in

cash at the end of 1997. Propounder testified she had no documentation to prove the existence of any such agreement.

In October 1997, propounder brought McDonald to Haney's office because they believed McDonald's will had been drafted. Haney, in propounder's presence, offered to go over the will with McDonald. After that offer, Haney did not hear from McDonald again, which he considered unusual, since she had always contacted him on a weekly basis. When Haney contacted McDonald, her "tone" was completely different and she stated she would not be needing his help. McDonald never contacted Haney again, and when he saw her in public, McDonald, who was always with propounder, was "very cold." Williams testified propounder told her Haney had tried to embezzle money from McDonald, that he should no longer have any contact whatsoever with McDonald, and that she was going to make certain Haney would not be permitted entry into McDonald's retirement home. Haney denied any wrongdoing.

On 20 October 1997 McDonald executed a will purporting to leave the bulk of her substantial estate to propounder, with the exception of three $5,000 charitable bequests and $5,000 for McDonald's neighbor. Propounder presented the testimony of Robert Page, the attorney who drafted McDonald's will. Page testified that during his meetings with McDonald regarding the will, her emotional state appeared to be "very good," and that she was "in control of herself mentally." Page testified McDonald already had a holographic will. That will was executed in 1973, and directed that her estate be given to her husband, or if he was not living, to Mary Louise, with the exception of $1,000 to be given to caveator. Page further testified that throughout the process of drafting McDonald's will, he did not know who propounder was, and that the person who brought McDonald to his office generally stayed in the reception area and was not a part of his discussions with McDonald. Page also testified that during the actual execution of the will, he believed the only people present in the room were himself, McDonald, and two of his staff people who functioned as witnesses. Page testified it was his opinion McDonald was of sound mind when executing the will and that she did so without constraint or undue influence.

In December 1997, shortly after propounder stopped working, she began writing checks for $10,000 on McDonald's account to herself and each of her family members; she had McDonald sign the checks. Again in January 1998, propounder wrote out $30,000 in checks signed by McDonald transferring McDonald's money to pro-

pounder's family, in addition to a check for $21,800 for the purchase of a vehicle in propounder's name. Propounder again wrote out checks to her family members totaling $30,000 in January 1999 and had McDonald sign them. Propounder testified McDonald did this at the direction of attorney Page to reduce her estate for tax purposes. Additionally, propounder began writing checks to "cash" from McDonald's account in October 1997 and every month thereafter in the amount of $1,600. Propounder testified the money was going to Williams to put in a trust fund for her grandchildren. Williams testified she had never heard of any such trust and received no checks from McDonald or propounder.

McDonald died on 23 February 1999. Williams testified that when she saw a copy of McDonald's will following her death, she called propounder because she "wanted to know the truth" about the will. Williams testified propounder and her husband thereafter came to Williams' house and confronted her. When Williams asked about caveator, propounder "threaten[ed]" her and stated that if she caused any problems with the will, propounder would create problems for Williams. Williams testified propounder stood in front of her in a threatening manner with her hands on her hips, stating she "knew the ropes," and Williams had "better stay out of it."

Additionally, several witnesses testified propounder had a general reputation for untruthfulness. Davis testified propounder told her after Mary Louise's death that she had contacted caveator, and he had expressed that he did not want "any part of anything." Williams also testified that after Mary Louise's death, propounder told her she had traveled to Asheville to visit caveator, and that he stated he "didn't want any part of [McDonald]." After McDonald's death, propounder again told Williams she had spoken to caveator and he had expressed wanting nothing to do with his mother and that "there was no need in trying to get in touch with him." Caveator testified in his deposition that he had not even heard of propounder until he visited Moore County in July 2000 and was informed by Cameron, Davis, Williams and Laverdure that propounder had received the bulk of his mother's estate. Caveator testified all four women were surprised to discover he had never been informed of the deaths of his sister and mother because they had all been led to believe propounder had contacted him.

Propounder's motion for a directed verdict at the close of caveator's evidence was denied. The jury returned a verdict, finding McDonald's will was procured through undue influence and was not

her true will. The trial court entered judgment on the verdict, ordering that the will have no legal effect. Propounder's motions for judgment notwithstanding the verdict and a new trial were denied. Propounder appeals.

---

**[1]** Propounder brings forth sixteen assignments of error contained within six arguments. Propounder first argues the trial court erred in denying her motions for directed verdict, judgment notwithstanding the verdict and a new trial because the evidence was insufficient to sustain the verdict. Our standard of review for the denial of a motion for directed verdict and judgment notwithstanding the verdict is the same, that is, whether the evidence was sufficient to submit the issue to the jury. *Alexander v. Alexander*, 152 N.C. App. 169, 170-71, 567 S.E.2d 211, 213 (2002). "The standard is high for the moving party as the motion should be denied if there is more than a scintilla of evidence to support the [non-movant's] prima facie case." *Id.* Further, the non-movant's evidence must be taken as true, with all contradictions, conflicts, and inconsistencies resolved in the non-movant's favor, giving him the benefit of every reasonable inference. *Id.* The standard of review for the denial of a new trial motion based on insufficiency of the evidence is "simply whether the record affirmatively demonstrates an abuse of discretion by the trial court in doing so." *In re Will of Buck*, 350 N.C. 621, 629, 516 S.E.2d 858, 863 (1999).

Undue influence is the " ' "fraudulent influence over the mind and will of another to the extent that the professed action is not freely done but is in truth the act of the one who procures the result." ' " *In re Estate of Whitaker v. Holyfield*, 144 N.C. App. 295, 300, 547 S.E.2d 853, 857-58 (citations omitted), *disc. review denied*, 354 N.C. 218, 555 S.E.2d 278 (2001). In order to state a *prima facie* case on the issue of undue influence, a caveator must prove the existence of four factors: " '(1) a person who is subject to influence; (2) an opportunity to exert influence; (3) a disposition to exert influence; and (4) a result indicating undue influence.' " *In re Will of Campbell*, 155 N.C. App. 441, 454, 573 S.E.2d 550, 560 (2002) (citation omitted).

Our Supreme Court has identified seven factors probative on the issue of undue influence: (1) old age and physical and mental weakness of the person executing the will; (2) the person executing the will is in the home of the beneficiary and subject to the beneficiary's constant association and supervision; (3) others have little or no opportunity to see her; (4) the will is different from and revokes a prior will; (5) the beneficiary is not a blood relative; (6) the will dis-

inherits the natural objects of her bounty; and (7) the beneficiary procured the will's execution. *Id.* at 455-56, 573 S.E.2d at 561. However, the list is not exhaustive, and the Supreme Court has recognized "the impossibility of setting forth all the various combinations of factors which make out a case of undue influence." *In re Will of Fields*, 75 N.C. App. 649, 651, 331 S.E.2d 193, 194 (1985).

Moreover, due to the difficulty in proving the existence of undue influence, our courts have recognized "it must usually be proved by evidence of a combination of surrounding facts, circumstances and inferences from which a jury could find that the person's act was not the product of his own free and unconstrained will, but instead was the result of an overpowering influence over him by another." *Campbell*, 155 N.C. App. at 454, 573 S.E.2d at 560. "Direct proof of undue influence is not necessary and is rarely available; circumstantial evidence may be considered . . . . In fact, '[t]he more adroit and cunning the person exercising the influence, the more difficult it is to detect the badges of undue influence and to prove that it existed.' " *In re Will of Everhart*, 88 N.C. App. 572, 574, 364 S.E.2d 173, 174 (citations omitted), *disc. review denied*, 322 N.C. 112, 367 S.E.2d 910 (1988). Accordingly, each surrounding fact and circumstance, though standing alone may have little import, when taken together may permit an inference that the testatrix's wishes and free will had been overcome by another. *In re Will of Sechrest*, 140 N.C. App. 464, 469, 537 S.E.2d 511, 515 (2000), *disc. review denied*, 353 N.C. 375, 547 S.E.2d 16 (2001).

In the present case, propounder relies heavily on the seven relevant factors set forth by our Supreme Court, arguing there was no evidence McDonald suffered from any mental weakness; that McDonald did not live with propounder and interacted with other family and friends; that the primary beneficiaries of McDonald's prior will were deceased; that caveator was not the natural object of McDonald's bounty because of their estranged relationship; and that there was no evidence propounder procured the will's execution, and indeed, Page's testimony established McDonald was of sound mind during execution of her will, and that propounder was not present or otherwise involved with Page.

However, as to the seven factors, caveator's evidence, taken as true, established McDonald was a few days shy of being 87 years old at the time she executed the will; that McDonald had experienced some mental weakness, as established by Cameron's testimony that she became easily confused by her medications and was incapable of

understanding basic tasks such as operating a microwave; that McDonald was physically weak, as established by Cameron's testimony that she had to assist McDonald with activities such as bathing, that McDonald could no longer drive, and that she moved to an assisted living home where she could receive constant care; that propounder was wholly involved in McDonald's affairs and attempted to limit McDonald's contact with others, and particularly, caveator; that the will was different from McDonald's 1973 will inasmuch as that will purported to leave McDonald's estate to her immediate family, including a certain amount to caveator, whereas her 1997 will was made in favor of propounder, who was of no blood relation to McDonald and had only been involved in McDonald's life for 2 of her 87 years at most; and that the 1997 will disinherited McDonald's only living child, as well as various other blood relatives, including Norman Paschal, whom McDonald had originally considered as an appropriate beneficiary.

Moreover, as to the factor of propounder having procured the will's execution in her favor, caveator presented evidence which although circumstantial, when taken together and as true, established a pattern of manipulation and deceit by propounder in an effort to isolate McDonald from others and influence her to name propounder beneficiary of her estate. The evidence established that propounder, who was theretofore insignificant in McDonald's life, became exceedingly involved in her affairs following Mary Louise's death, an event which devastated McDonald and caused a dramatic change in her personality; that McDonald was uncharacteristically submissive to propounder because she told McDonald Mary Louise had asked her to take care of McDonald, and McDonald always wanted to please Mary Louise; that propounder told McDonald she could only look after her if McDonald gave her the money to do so; that propounder repeatedly directed McDonald what to do by stating it was what Mary Louise wanted, which statements had a significant impact on McDonald; that it was apparent in meetings with Haney regarding McDonald's will and finances that McDonald was easily swayed and depended on someone else to direct her; that when propounder discovered McDonald had suggested her blood nephew as a beneficiary of her estate, propounder solicited Haney's assistance in changing McDonald's mind and ensuring Paschal would not be involved with the will; that propounder became exceedingly involved in McDonald's life, constantly driving McDonald places and assisting her in all areas, including moving her into the retirement home and handling her bills; that propounder also became involved in

**IN RE WILL OF McDONALD**

[156 N.C. App. 220 (2003)]

McDonald's financial affairs, going through Mary Louise's financial documents and actively leading all meetings with McDonald's investment planner while McDonald simply sat quietly; that these meetings resulted in propounder being named beneficiary of McDonald's investments; that just prior to execution of the will, propounder announced her retirement, and thereafter gave conflicting reasons as to why she was able to retire; that a few weeks after her retirement and execution of the will, propounder wrote several substantial checks to herself and her family from McDonald's account which she had McDonald sign; and that propounder lied about monthly checks she wrote to "cash" out of McDonald's account within days of being named beneficiary of the will.

The evidence further permitted reasonable inferences that propounder sought to and did prevent McDonald from contacting Norman Paschal or caveator by blocking McDonald from making long-distance telephone calls; that propounder sought to and did limit McDonald's contact with others, as evidenced through her lies to Cameron that McDonald did not want her to visit, and regarding Haney's embezzlement of McDonald's money after he offered to explain the will to McDonald and refused to assist propounder in ensuring Paschal would not be involved with the will; that propounder lied to several of McDonald's family and close friends, and inferentially, to McDonald herself about having contacted caveator after both Mary Louise's and McDonald's deaths, relaying that caveator did not want anything to do with his family and did not wish to be contacted; and that propounder threatened Williams, McDonald's niece, and ordered her to "stay out of it" when Williams asked about caveator after seeing a copy of the will.

We hold such evidence, when viewed under the appropriate standard, constituted more than a scintilla of evidence from which the jury could reasonably find the existence of the four elements of undue influence: (1) that McDonald, in the weeks following Mary Louise's death and leading up to the execution of the will, was a person who was subject to influence; (2) that propounder, who suddenly became wholly involved in McDonald's affairs, had an opportunity to exert influence over McDonald; (3) that propounder, who, among other things, directly solicited Haney's assistance in persuading McDonald not to involve Paschal with the will, had a disposition to exert influence; and (4) the result indicates the presence of undue influence.

IN RE WILL OF McDONALD

[156 N.C. App. 220 (2003)]

Although propounder presented some evidence which conflicts with caveator's, such as Page's testimony that McDonald appeared to be of a strong and independent mental state, any such inconsistencies must be resolved in favor of the non-movant in ruling upon the motions. Though the fact propounder was not, according to Page, present during the negotiation and execution of the will is a factor favorable to propounder, we disagree that this factor was sufficient grounds on which to take the issue from the jury, in light of caveator's substantial evidence of the circumstances leading up to the execution of the will.

Finally, in light of all of the evidence, we discern no abuse of discretion in the trial court's denial of propounder's motion for a new trial. Accordingly, these assignments of error are overruled.

[2] Propounder next argues the trial court erred in denying her motion *in limine* and admitting evidence regarding the sale of her trucking business, asserting such evidence was wholly irrelevant and impermissibly admitted to establish her character for untruthfulness. The trial court specifically found information regarding the sale of propounder's trucking business was relevant and that its probative value would not be outweighed by the danger of unfair prejudice. A trial court's determination of admissibility and whether the probative value of evidence outweighs its potential prejudice is within its sound discretion. *Allen v. Roberts Constr. Co.*, 138 N.C. App. 557, 532 S.E.2d 534, *disc. review denied*, 353 N.C. 261, 546 S.E.2d 90 (2000). Likewise, the denial of a motion *in limine* will not be reversed absent an abuse of discretion. *Nunnery v. Baucom*, 135 N.C. App. 556, 521 S.E.2d 479 (1999).

We discern no abuse of discretion in the trial court's determination of relevancy and admissibility given that propounder told other witnesses and testified in her deposition that the sale of her trucking business was the reason she announced her retirement days prior to execution of the will. Caveator sought to prove this reason as untruthful to establish a pattern of deceit surrounding the will, and to show propounder knew she was to be named the primary beneficiary and was motivated to conceal this fact from others who might raise questions about her retirement and the will. Although, by itself, evidence of the sale of the trucking business may not have been wholly significant, given the wide range of evidence to be considered in cases of undue influence, the evidence was probative when viewed in conjunction with the totality of the circumstances. *See, e.g., In*

*re Will of Thompson*, 248 N.C. 588, 593, 104 S.E.2d 280, 284 (1958) (regarding undue influence, " '[w]e cannot judge of the importance of the bit of mosaic being laid at the time or the part of the pattern being woven except in connection with the whole design.' " (citation omitted)).

Propounder argues that the evidence admitted went beyond evidence of the sale of the trucking business, and addressed issues regarding the way in which propounder conducted that business solely to prove her character for untruthfulness. However, we reject her argument. Even if admitted in error, this evidence was not prejudicial in light of other evidence of instances of propounder's untruthfulness, and the testimony of several witnesses as to her general reputation in the community as untrustworthy.

[3] Next, propounder argues the trial court erred in instructing the jury that it could consider, in determining the existence of undue influence, whether: (1) McDonald was subjected to misrepresentations regarding the wishes of her natural children; (2) propounder obtained other transfers of property from McDonald; and (3) propounder was disposed to exert undue influence. Propounder argues none of these instructions was supported by the evidence.

A trial court may instruct the jury as to claims or defenses that are supported by the evidence when viewed in the light most favorable to the proponent of the instruction. *Hill v. McCall*, 148 N.C. App. 698, 559 S.E.2d 265 (2002). We hold each instruction in the present case was amply supported by the evidence and was relevant to the issue of undue influence.

As to the court's instruction that the jury could consider whether McDonald was subjected to misrepresentations about the wishes of her children, caveator presented substantial evidence showing propounder consistently controlled McDonald by representing that she knew what Mary Louise would like for McDonald to be doing and that Mary Louise specifically requested that propounder care for McDonald. Moreover, caveator presented evidence from several witnesses that propounder lied about having contacted caveator after the death of Mary Louise and represented to others that caveator wanted nothing to do with his family and did not wish to be contacted.

As to the instruction regarding propounder having obtained other transfers of property from McDonald, the evidence established pro-

pounder wrote herself checks from McDonald's account and had McDonald sign the checks, including a check for $21,800 for the purchase of a vehicle in propounder's name. Moreover, the evidence also established propounder regularly wrote checks to "cash" from McDonald's account, stating the money was being used for a trust fund for Williams' grandchildren, of which Williams denied any knowledge. Propounder argues this evidence simply indicates McDonald was following Page's advice to make *inter vivos* gifts to propounder; however it was for the jury to determine what the evidence indicated. The fact remains there existed evidence that propounder obtained transfers of property from McDonald, and the instruction was therefore warranted.

Finally, there existed ample evidence, as detailed in Part I of this opinion, of propounder's disposition to exert undue influence over McDonald. Accordingly, the trial court did not err in instructing the jury as to these issues, and these assignments of error are therefore overruled.

[4] Propounder next maintains the trial court erred in permitting Haney to testify as to his opinion that he could have swayed McDonald in making decisions had he so desired. Propounder argues caveator failed to present a sufficient foundation by showing the statement was rationally based on Haney's perceptions. We disagree. Under G.S. § 8C-1, Rule 701, a lay witness may testify regarding an opinion or inference which is both "rationally based on the perception of the witness" and "helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701 (2002).

In this case, the testimony at issue was rationally based on Haney's perception of McDonald over the course of many dealings with her, and was also helpful to a determination of a fact in issue, whether McDonald was susceptible to influence in the time leading up to the execution of her will. In any event, not only was there ample testimony from other witnesses about McDonald's susceptibility to influence, but propounder's counsel later yielded essentially the same statement from Haney on cross-examination, thereby precluding objection from propounder and rendering any error harmless. *See, e.g., Brooks v. Wal-Mart Stores, Inc.*, 139 N.C. App. 637, 535 S.E.2d 55 (2000), *disc. review denied*, 353 N.C. 370, 547 S.E.2d 2 (2001).

[5] Finally, propounder argues the trial court committed reversible error in denying her motion for attorney's fees and costs because the

court was first required to enter findings of fact on whether pro-
pounder's position, although unsuccessful, was supported by sub-
stantial merit. .G.S. § 6-21 provides the requisite statutory authority
for a court to award fees and costs to either party in a will caveat pro-
ceeding. N.C. Gen. Stat. § 6-21(2) (2002). The statute requires that
prior to awarding attorney's fees to the *caveator*, the trial court must
make a finding of fact that the proceeding had substantial merit. N.C.
Gen. Stat. § 6-21(2). The statute does not, however, require the trial
court make any such findings in the case of a propounder.
Propounder has not cited any authority for her proposition that
the trial court must make such a finding before denying a pro-
pounder's motion, and we decline to read this requirement into the
plain language of G.S. § 6-21. A trial court's decision whether to
award attorney's fees and costs to a propounder under G.S. § 6-21 is
within its sound discretion. *In re Will of Ridge*, 302 N.C. 375, 275
S.E.2d 424 (1981). No abuse of discretion is present here, given the
jury's verdict that the will was procured through propounder's exer-
tion of undue influence.

No error.

Judges HUDSON and STEELMAN concur.